## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN RE SUBPOENA *DUCES TECUM* TO JOSEPH L. BRAND** | **MISC. CASE NO.** _____ |
| **FELIPE VICINI LLUBERES and JUAN VICINI LLUBERES,**<br><br>**Plaintiffs,**<br><br>vs.<br><br>**UNCOMMON PRODUCTIONS, LLC**<br>*760 Main Street, Third Floor*<br>*Waltham, MA  02451*<br><br>**and WILLIAM M. HANEY III,**<br>*61 Lincoln Road*<br>*Wayland, MA  01778*<br><br>**Defendants.** | **CIVIL ACTION NO. 07-11623 (D. Mass.)** |

## MOTION TO COMPEL COMPLIANCE WITH SUBPOENA *DUCES TECUM* AND REQUEST FOR ORDER TO SHOW CAUSE WHY NON-PARTY JOSEPH L. BRAND SHOULD NOT BE HELD IN CONTEMPT

Pursuant to Rule 45 of the Federal Rules of Civil Procedure, Uncommon Productions, LLC, and William M. Haney III ("Movants"), defendants in the civil action *Lluberes, et al. v. Uncommon Prods., LLC, et al.*, No. 1:07-cv-11623 (D. Mass.), by and through their undersigned counsel, respectfully move for an order compelling Joseph L. Brand ("Brand") to immediately and fully comply with a subpoena *duces tecum* served upon him on July 28, 2008, and to show cause why he should not be held in contempt for his noncompliance.  Movants further request that the Court order Brand to reimburse them for the attorneys' fees and costs they incurred in connection with this motion or provide such other relief as the Court deems appropriate.

As grounds therefore, Movants rely upon the memorandum of points and authorities and the accompanying declaration and exhibits filed contemporaneously herewith.

Dated:  August 11, 2008

Respectfully submitted,

LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.

By: _____
Elizabeth C. Koch
Thomas Curley
John B. O'Keefe, D.C. Bar No. 974892
1050 Seventeenth Street, N.W., Suite 800
Washington, DC  20036
Telephone:  (202) 508-1100
Email:  jokeefe@lskslaw.com

*Counsel for Movants/Defendants*

2

## CERTIFICATE OF SERVICE

I hereby certify that, on this 11th day of August, 2008, I caused true and correct copies of the foregoing Motion to Compel Compliance with Subpoena Duces Tecum and Request for Order to Show Cause Why Non-Party Joseph L. Brand Should Not Be Held in Contempt and the accompanying Memorandum of Points and Authorities, declaration, and exhibits to be served on the following persons by the indicated means:

By Hand Delivery:

Benjamin G. Chew, Esq.
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, DC 20037

*Counsel for Plaintiffs and Joseph L. Brand*

John B. O'Keefe

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE SUBPOENA *DUCES TECUM* TO JOSEPH L. BRAND | MISC. CASE NO. _____ |
| FELIPE VICINI LLUBERES and JUAN VICINI LLUBERES, <br><br> Plaintiffs, <br><br> vs. <br><br> UNCOMMON PRODUCTIONS, LLC and WILLIAM M. HANEY III, <br><br> Defendants. | CIVIL ACTION NO. 07-11623 (D. Mass.) |

<u>**ORDER**</u>

Upon consideration of the Motion to Compel Compliance with Subpoena *Duces Tecum* and Request for Order to Show Cause Why Non-Party Joseph L. Brand Should Not Be Held in Contempt, and the entire record herein, it is hereby

**ORDERED** that the Motion is **GRANTED**; it is further

**ORDERED** that Joseph L. Brand shall, by no later than three business days from the date of this Order, fully produce to Movants all documents responsive to the subpoena *duces tecum* served upon him on July 28, 2008; it is further

**ORDERED** that Mr. Brand shall appear for a deposition as soon as practicable, but no later than eight business days from the date of this Order; and it is further

**ORDERED** that Mr. Brand shall reimburse Movants for the reasonable attorneys' fees and costs associated with this motion.

It is **SO ORDERED** this _____ day of _____, 2008.

_____
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE SUBPOENA *DUCES TECUM* TO JOSEPH L. BRAND | MISC. CASE NO. _____ |
| FELIPE VICINI LLUBERES and JUAN VICINI LLUBERES,<br><br>Plaintiffs,<br><br>vs.<br><br>UNCOMMON PRODUCTIONS, LLC and WILLIAM M. HANEY III,<br><br>Defendants. | CIVIL ACTION NO. 07-11623 (D. Mass.) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO COMPEL COMPLIANCE WITH SUBPOENA *DUCES TECUM*
AND REQUEST FOR ORDER TO SHOW CAUSE WHY NON-PARTY
JOSEPH L. BRAND SHOULD NOT BE HELD IN CONTEMPT**

Movants Uncommon Productions, LLC, and William M. Haney III, producers of the

documentary film *The Price of Sugar*, are defendants in a libel action brought by Felipe and Juan

Vicini Lluberes ("the Vicinis"), two wealthy and powerful sugar barons in the Dominican

Republic who claim that Movants' film includes false and defamatory statements or implications

about them. In defense against these claims, Movants served a subpoena *duces tecum* on Joseph

L. Brand ("Brand"), a Washington lobbyist who has functioned as the Vicinis' agent in

attempting to influence United States government actions and policies concerning the

impoverished and exploited migrants who work and live on Dominican sugar plantations,

including those owned by the Vicinis.

Although the materials and testimony sought by the subpoena plainly relate to a contested

issue in the litigation – namely, the Vicinis' status as public figures for purposes of the

constitutional law of defamation – Brand has wholly refused to turn over any documents and, in willful defiance of this Court's subpoena power, neither appeared for his deposition nor sought relief from his obligation to do so. Accordingly, Movants have filed the accompanying motion to compel Brand's compliance with the subpoena and a request for an order to show cause why Brand should not be held in contempt. Pursuant to Local Rule 7(a) of this Court, Movants respectfully submit this memorandum of points and authorities in support of the motion.

## BACKGROUND

A.    The Underlying Litigation

The subpoena at issue was served on Brand in connection with a civil action that arises out of the motion picture *The Price of Sugar* (the "Film"). *See Lluberes, et al. v. Uncommon Prods., LLC, et al.*, No. 1:07-cv-11623 (D. Mass.) ("the Litigation"). This human-rights film publicizes the appalling working and living conditions of dispossessed Haitians who harvest sugar cane by hand in the Dominican Republic. The poorest of the poor, the Haitian laborers typically work long hours for little pay and without access to decent housing, sanitation facilities, education, health care or adequate nutrition for themselves or their families.

The Film, produced over the course of three years, tells the story of the cane cutters' plight through the experiences of an extraordinary and controversial Catholic missionary, Father Christopher Hartley, who challenged those abusive conditions. In the process, the Film touches on a number of public controversies in which the Vicinis were central figures, including the deplorable state of the shanty villages (or "bateyes") where the Haitian cane cutters are housed; the prevalence of child labor, disease and malnutrition on the sugar plantations; the effects of international trade agreements on the Dominican agricultural economy; the efforts of charitable, religious, and nonprofit organizations – and Father Hartley, in particular – to assist the Haitian cane cutters and their families; and related socio-economic turmoil in the country.

2

The Vicinis, members of a prominent Dominican family that owns many of the country's sugar plantations, have brought this defamation suit against the producers of *The Price of Sugar* in an attempt to censor the Film and prevent its makers from bringing attention to the truth about their shameful labor practices. Movants are defending against the Vicinis' claims by, among other things, amassing proof that the Vicinis are "public figures" who, consequently, must establish that Movants published the alleged defamatory falsehoods with "actual malice." *See, e.g., Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974).

This is the third subpoena-enforcement matter relating to the Litigation that has come before this Court. The previous two matters involved disputes surrounding subpoenas directed by the Vicinis to Father Hartley and various current and former employees of the U.S. Department of State ("State Department"). *See* Misc. Case Nos. 08-10, 08-384.[1]

B.    The Relationship of Brand and His Firm to the Vicinis

Brand is a partner at the law and lobbying firm Patton Boggs LLP, which, on information and belief, has represented the Vicinis and their various business interests since at least early 2006, and perhaps longer. Other attorneys at Patton Boggs besides Brand are presently serving as counsel for the Vicinis in the Litigation.

On or about July 24, 2008, Movants received a production of documents from the State Department in connection with the Litigation. Included among the agency's documents was an electronic mail message sent by Brand to four State Department officials, including two officials (Alexander Bryan and David Searby) whom the Vicinis are seeking to depose in the Litigation. The email – dated June 29, 2007 – references a meeting attended by Brand and the officials on

---

[1] The cut-off for discovery in the Litigation is today, August 11. Movants, however, have a pending motion for leave to take certain discovery out of time and are submitting to the trial court today a notice regarding this motion that will add Brand's subpoenaed documents and deposition to the items of discovery for which leave to take out of time is sought.

May 29, 2007, and attaches a "white paper" prepared by Brand "on the facts of the Vicini sugar operation as they relate[] to the Haitian migrants' issue" as well as a so-called "leave behind" document addressing (supposedly "misdirected") criticisms of the "Vicini family" for their "treatment of Haitian migrant workers in the Dominican Republic." *See* Declaration of Elizabeth C. Koch ("Koch Decl."), Ex. 1 at STATE-D001, STATE-D012. Brand's white paper catalogs and responds to about two dozen statements that were made by the State Department, the U.S. Department of Labor, the United Nations, and Amnesty International and other non-governmental organizations from 2005 through 2007 about the human rights abuses of the Dominican sugar industry generally and the Vicinis specifically. *See id.* at STATE-D002-11.

Public records further indicate that, as of July 19, 2008, when their most recent disclosure report to the U.S. Senate was filed, Brand and his colleagues at Patton Boggs had been paid approximately $400,000 by the Vicinis to lobby Congress and federal agencies on the subject of "[l]abor issues in the Dominican Republic." *See* Koch Decl., Ex. 2.

Prior to receiving the Brand email from the State Department, Movants had no evidence that the Vicinis had engaged in lobbying activities specifically relating to the living and working conditions on their sugar plantations.[2]

C.    The Subpoena

After obtaining the Brand white paper, counsel for Movants made several attempts to contact Brand by telephone to discuss obtaining relevant evidence from him and to arrange for service of a subpoena, but Brand did not respond to messages that were left for him. *See* Koch

---

[2] The Vicinis have thus far declined to fully answer an interrogatory in the Litigation asking them to "[i]dentify all press agents, publicists, public relations, advertising persons, or lobbyists who have performed services for [the Vicinis or their businesses], directly or indirectly, [during the prior ten years] and describe the nature of the work performed, the time period during which the work was performed, and the remuneration paid for the work." They have simply denied engaging such persons or firms "in their individual capacities." A motion to compel relating to that interrogatory is pending before the district court in Massachusetts.

Decl. ¶ 1. Movants thereafter issued a subpoena *duces tecum* ("the Subpoena") from this Court

seeking documents and testimony from Brand relating to his lobbying activities on behalf of the

Vicinis. The Subpoena – which was served on Brand personally at his office in the District of

Columbia at 4:08 p.m. on July 28, *see* Koch Decl., Ex. 3 – called for Brand to produce:

> All *non-privileged* documents that in any manner relate to
> Lobbying Services provided by you or Patton Boggs, LLP for or
> on behalf of The Vicinis for the period 2003 to the present.

Koch Decl., Ex. 4 at Ex. A (emphasis added). Movants narrowly tailored the Subpoena by

limiting the definition of "Lobbying Services" to encompass only "communications with any

employee, official, or agent of the United States government – including the Executive and

Legislative branches and any independent agencies or contractors, but excluding the Judiciary"

and by restricting the definition of "The Vicinis" to just the named plaintiffs in the Litigation,

Felipe Vicini Lluberes and Juan Vicini Lluberes, and the companies they own or control that are

involved in the sugar business (as distinguished from the companies they own in the banking,

insurance, media, tourism or construction industries). *See id.*

    D.   <u>Brand's Response to the Subpoena</u>

The Subpoena set a deadline of August 4, 2008, for production of the requested

documents and called for Brand's deposition to be held in Movants' counsel's offices in the

District of Columbia on August 5.[3]  By letter dated August 1, Benjamin G. Chew, the Patton

Boggs attorney who is serving as lead counsel for the Vicinis in the Litigation, objected to the

Subpoena, stating that its request for documents was vague, overbroad, and cumulative, that it

imposed an undue burden, and that it sought materials that would be irrelevant to the Litigation.

---

[3] In the cover letter accompanying the subpoena, Movants' counsel offered to
accommodate Brand's schedule to the extent possible by continuing the deposition until a later
date within the remaining discovery period. *See* Koch Decl., Ex 5.

*See* Koch Decl., Ex. 6 at 2-3.[4]  Based on those objections, Brand refused to produce any of the requested materials.

The objection letter from Mr. Chew further stated that "Brand will not be made available for deposition on August 5, 2008, or on any other date absent a court order," *id.* at 3, and demanded that Movants withdraw the Subpoena, which it described as "a tactic to manufacture grounds to disqualify counsel," *id.*  Brand did not appear for the deposition on August 5, nor did he move to have the subpoena quashed or modified.[5]

<div align="center">STANDARD OF REVIEW</div>

The Federal Rules of Civil Procedure provide that litigants may obtain "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense" and that "appears reasonably calculated to lead to the discovery of admissible evidence." FED. R. CIV. P. 26(b)(1).  Such discovery may be obtained from a non-party through service of a subpoena commanding attendance at a deposition and/or the production or inspection of documents, electronically stored information, and tangible things. FED. R. CIV. P. 45(a).  The district court from which a subpoena is issued has authority to enforce compliance and may hold in contempt and sanction any "person who, having been served, fails without adequate excuse to obey the subpoena." FED. R. CIV. P. 45(e).

---

[4] The objection letter went on to say that the "neither Mr. Brand nor [Patton Boggs] have provided lobbying services to Juan and Felipe Vicini Lluberes," Koch Decl., Ex. 6, apparently in contradistinction to the lobbying services the firm has provided to the Vicinis' sugar companies.

[5] The separate contention by the Vicinis' counsel that Movants did not provide them with advance notice of the subpoena, as required by Rule 45(b)(1) of the Federal Rules of Civil Procedure, is unfounded.  A copy of the subpoena was hand-delivered to Mr. Chew's office on July 25, three days before Brand was served. *See* Koch Decl. ¶ 3.  Moreover, this is an odd objection coming from Mr. Chew, who provided no advance notice to Movants of the subpoena that he directed to Father Hartley and that led to motions practice before this Court.

Where, as here, the appropriateness of service and the existence of territorial jurisdiction are undisputed,[6] the non-party resisting compliance with the subpoena bears the burden of establishing the validity of his objections. *See, e.g., In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 70 (2d Cir. 2003) ("a party seeking a deposition need not demonstrate the propriety of its request"; rather, objecting deponent must show that "the facts and circumstances are such that it creates an inappropriate burden or hardship"); *Halliburton Energy Servs. v. M-I, LLC*, No. No. H06-MC-53, 2006 WL 2663948, at *2 (S.D. Tex. Sept. 15, 2006) (subpoenaed non-party must establish that compliance would be unreasonable or oppressive); *Overton v. Todman & Co.*, 249 F.R.D. 147, 148 (S.D.N.Y. 2008) (non-party opposing motion to compel compliance with subpoena must prove applicability of claimed privilege); *In re Rule 45 Subpoena Issued to Robert K. Kochan*, No. 5:07-MC-44, 2007 WL 4208555, at *5 (E.D.N.C. Nov. 26, 2007) ("The courts have time and again held that . . . reliance on naked contentions [of subpoena's overbreadth, undue burden, or irrelevance] is inadequate[.]"). Rarely do courts find that the "extraordinary measure[]" of a "complete prohibition" against a non-party's deposition is appropriate. *Alexander v. FBI*, 186 F.R.D. 71, 75 (D.D.C. 1998).

## ARGUMENT

A.   Brand's Association with Plaintiffs' Litigation Counsel Does Not Exempt Him from Compliance with this Narrowly Tailored Subpoena.

Brand seeks to exempt himself from the ordinary rules of civil discovery by claiming to be the Vicinis' "trial counsel" in the Litigation. *See* Koch Decl., Ex. 6 at 1-3. Even if he were the Vicinis' litigation counsel – which he is not – the law does not support Brand's absolutist position. Moreover, the facts of this case and of Brand's representation of the Vicinis, as well as

---

[6] Brand resides and is employed in the district from which the subpoena was issued.

the limited nature of the discovery sought from him, amply justify this Court's enforcement of the Subpoena.

Although it is true that federal courts "have resisted the idea that lawyers should routinely be subject to broad discovery," *In re Subpoena Issued to Dennis Friedman*, 350 F.3d at 70, it is likewise true that this judicial "disfavor with . . . the practice of seeking discovery from adversary counsel . . . is not a talisman for the resolution of all controversies of this nature," *id.* at 71. *See, e.g., United States v. Philip Morris Inc.*, 209 F.R.D. 13, 19 (D.D.C. 2002) ("Federal Rules of Civil Procedure create no special presumptions or exceptions for lawyers[.]"); *Johnston Dev. Group, Inc. v. Carpenters Local Union No. 1578*, 130 F.R.D. 348, 352 (D.N.J. 1990) ("There is no general prohibition against obtaining the deposition of adverse counsel regarding relevant, non-privileged information. . . . In cases where the attorney's conduct itself is the basis of a claim or defense, there is little doubt that the attorney may be examined as any other witness."). Hence, as the leading treatise on federal civil procedure explains, "[t]he fact that the proposed deponent is an attorney, or even an attorney for a party to the suit, is not an absolute bar to taking his or her deposition," even though privilege objections may be proper to some lines of questioning. 8A Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, FEDERAL PRACTICE & PROCEDURE ("WRIGHT & MILLER") § 2102 (2d. ed. & Suppl. 2008).

The preferred approach to such situations is for "the judicial officer supervising discovery [to] take[] into consideration all of the relevant facts and circumstances to determine whether the proposed deposition would entail an inappropriate burden or hardship," which considerations may include "the need to depose the lawyer, the lawyer's role in connection with the matter on which discovery is sought and in relation to the pending litigation, the risk of encountering privilege and work-product issues, and the extent of discovery already conducted." *In re Subpoena Issued to Dennis Friedman*, 350 F.3d at 72. "Under this approach, the fact that the

proposed deponent is a lawyer does not automatically insulate him or her from a deposition nor automatically require prior resort to alternative discovery devices, but it is a circumstance to be considered." *Id.*

In the D.C. Circuit, courts have followed this flexible approach and have allowed depositions of party attorneys to go forward – even in circumstances where the counsel-deponent was expected to play a role at trial (which is not the case here). *See, e.g., Evans v. Atwood*, No. 96-2746, 1999 WL 1032811, at *3 (D.D.C. 1999) (permitting deposition of lawyer employed by party because two considerations underlying disfavored view of attorney depositions – disruptive effect on trial preparation and potential that witness may be disqualified from serving as counsel at trial – were not present where proposed deponent "is not counsel of record and there is nothing to suggest he currently plays a major role" in litigation); *Amicus Commc'ns v. Hewlett Packard Co.*, No. 99-0284, 1999 WL 33117227, at *3 (D.D.C. 1999) (compelling deposition of opposing counsel who was percipient witness to relevant nonprivileged facts and communications); *Sadowski v. Gudmundsson*, 206 F.R.D. 25, 26-27 (D.D.C. 2002) (trial counsel may be deposed on nonprivileged factual information, including facts about events that occurred after commencement of litigation).

Most notably, in *United States v. Philip Morris Inc.*, Judge Kessler permitted the plaintiff to depose four of defendants' in-house lawyers regarding marketing strategies, public relations efforts, and other corporate conduct similar to the lobbying activities as issue here. 209 F.R.D. at 15, 19. The court concluded that, because (1) defendants "knowingly assigned substantial non-legal, non-litigation responsibilities" to the lawyers, (2) plaintiff "was not seeking to depose counsel about the . . . litigation strategies related to this case," and (3) the proposed deponents

were "not litigation or trial counsel," there was no basis to prevent opposing counsel from deposing them. *Id.* at 17-18.[7]

In this case, Brand has not appeared as counsel of record (or even as "of counsel") for the Vicinis in the Litigation. Nor, for that matter, is he admitted to practice law in the jurisdiction where the action is pending. In other words, this case does not present the problematic situation where a lawyer might appear at trial before a jury as both an attorney and a witness. (In any event, Brand's testimony is likely relevant solely to an issue of law – the Vicinis' status as "public figures" – which will be determined by the court in advance of trial,[8] and, because no jury was demanded, any trial in this action would be to the court, rather than a jury.) Brand's role in representing the Vicinis, by all indications, has been limited to serving as their lobbyist in Washington, meeting with lawmakers, congressional staff, and officials of various federal agencies to try to rebut or deflect charges leveled against them by government observers and non-governmental (or inter-governmental) human rights advocates. *See* Koch Decl., Ex. 1.

The Subpoena, moreover, was carefully crafted to seek only information relating to communications with these federal agencies, *which plainly are not privileged*, and Brand's deposition would be similarly limited to relevant, nonprivileged topics, such as meetings and

---

[7] Indeed, even courts that have imposed substantial limitations on the circumstances in which a party's attorneys may be deposed have recognized that such special restrictions are inapplicable when, as here, the information sought relates to representation of the party *in another matter*. *See Pamida, Inc. v. E.S. Originals, Inc.*, 281 F.3d 726, 730-31 (8th Cir. 2002) (rule set forth in *Shelton v. American Motors Corp.* does not apply to efforts to depose counsel regarding facts of different case); *see also United States v. Philip Morris Inc.*, 209 F.R.D. 13, 17 (D.D.C. 2002) (Eighth Circuit's *Shelton* test applies to limit depositions of attorneys "in only two instances: (1) when trial and/or litigation counsel are being deposed, and (2) when such questioning would expose litigation strategy in the pending case"); *Ellipsis, Inc. v. Color Works, Inc.*, 227 F.R.D. 496, 497 (W.D. Tenn. 2005) (same).

[8] *See Pendleton v. City of Haverhill*, 156 F.3d 57, 68 (1st Cir. 1998) ("[T]he question of whether a defamation plaintiff is a public figure is properly resolved by the court, not by the jury, regardless of the contestability of the predicate facts[.]").

conversations with government employees about the Vicinis and their sugar interests.[9] Thus, the discovery sought is exceptionally narrow in scope. In addition, and as explained more fully below, this information is highly relevant to at least one of Movants' defenses: the constitutional privilege to publish critical statements about public figures based on a subjective belief in the truth of those statements. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974). Because the Vicinis' lobbying activities bear directly on their status as public figures, Brand's documents and testimony about those activities are of material importance to the defense.

Moreover, to the extent there may exist some slight "risk of encountering privilege and work-product issues," *In re Subpoena Issued to Dennis Friedman*, 350 F.3d at 72, in the course of obtaining discovery from Brand, that is a risk that – however unlikely – was created by the Vicinis themselves when they "knowingly assigned substantial non-legal, non-litigation responsibilities" (*i.e.*, lobbying responsibilities) to attorneys at Patton Boggs. *See Philip Morris Inc.*, 209 F.R.D. at 17. The Vicinis could have retained a lobbying firm separate from the law firm that is serving is their trial counsel, but they chose not to. Defamation plaintiffs cannot insulate themselves from questioning about their relevant lobbying activities by simply hiring their lobbyists' partners to handle the litigation, and defamation defendants should not be prejudiced in discovery by such tactical decisions.

Simply put, Brand's association with the Vicinis' Litigation counsel does not justify his refusal to comply with the Subpoena.

---

[9] The suggestion in Brand's objection letter that Movants should instead first attempt to obtain the information "from more readily accessible sources . . . such as . . . federal government personnel," Koch Decl., Ex. 1, is absurd. For starters, as noted above, the Vicinis have stonewalled Movants' efforts in the Litigation to obtain information from them about their lobbying activities. *See supra* n.2. Without any details about the specific officials with whom the Vicinis' lobbyists have been in contact, it would take perhaps hundreds of subpoenas to congressional offices and federal agencies to obtain the information that Brand possesses and that the Subpoena seeks.

11

B.     The Subpoena Seeks Information Relevant to Movants' Defense and Brand's Other Objections Are Meritless.

It is "well settled that the scope of discovery under a subpoena is the same as the scope of discovery under Rule 26(b)" – *i.e.*, the range of permissible discovery is "'exceedingly broad.'" *Commissariat A L'Energie Atomique v. Samsung Elecs. Co., Ltd.*, No. 8:06-mc-44, 2006 WL 5003562, at *2 (M.D. Fla. June 14, 2006) (citation omitted). Thus, federal courts have held that "a Rule 45 subpoena should be enforced unless it is clear that the evidence sought can have no possible bearing on the issues." *See Benavides v. Velocity IQ, Inc.*, No. 8:05-cv-1536, 2006 WL 680656, at *2 (M.D. Fla. Mar. 15, 2006) (internal quotations and citations omitted). Moreover, "[l]ocal courts whose only connection with a case is the supervision of [discovery] ancillary to an action elsewhere should be especially hesitant to pass judgment on what constitutes relevant evidence thereunder." *Horizons Titanium Corp. v. Norton Co.*, 290 F.2d 421, 425 (1st Cir. 1961).

Here, the information sought by the Subpoena about the lobbying services Brand provided to the Vicinis and their sugar business is relevant to determining a key contested issue: whether plaintiffs are "public figures" for purposes of this defamation action and therefore whether they are obliged to prove that the defendants acted with "actual malice" in communicating purportedly false and disparaging statements about plaintiffs. *See, e.g., Gertz*, 418 U.S. at 351. Because plaintiffs have refused to admit that they are public figures for purposes of their defamation claims, they have put directly at issue not only their reputations, but also the broad range of matters related to their public figure status, including their government relations efforts.

In *Gertz*, the Supreme Court adopted a sliding-scale approach to the public figure determination, informed by two touchstones. First, a public figure plaintiff is an individual who has pursued a course of conduct that foreseeably "invite[s] attention and comment." *Id.* at 345.

Second, a public figure plaintiff enjoys "access to the channels of effective communication" and thus has a realistic opportunity to respond to and rebut falsehoods. *Id.* at 344. Furthermore, to the extent a defamation plaintiff may be only a "limited purpose public figure," the legal analysis considers, *inter alia*, whether there existed at the time the challenged statements were published a "public controversy" in which the plaintiff played a central role and whether the alleged defamation is germane to that controversy. *See Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1296-98 (D.C. Cir. 1980); *Nicholson v. Promotors on Listings*, 159 F.R.D. 343, 344 (D. Mass. 1994). In deciding whether the totality of the circumstances paints a portrait of a public personage or a private individual, courts take into consideration such various factors as a plaintiff's prominence in society and public affairs, involvement in matters of public concern, and ability to influence the outcome of debate about such matters. In this way, courts acknowledge that some individuals are "pre-positioned" to play an influential role in various issues of public concern. *Tavoulareas v. Piro*, 817 F.2d 762, 772-73 (D.C. Cir. 1987).

Accordingly, in resolving the question of public figure status, courts regularly consider evidence relating to defamation plaintiffs' efforts to shape the opinions of the public at large and of government decision-makers. *See, e.g., Bongiovi v. Sullivan*, 138 P.3d 433, 446 (Nev. 2006) (noting that limited-purpose public figure status may turn on such behavior as "hiring a private lobbyist and public relations agent"); *OAO Alfa Bank v. Ctr. for Public Integrity*, 387 F. Supp. 2d 20, 45 (D.D.C. 2005) (reviewing evidence of defamation plaintiffs' "well-coordinated and sophisticated public relations strategy," as part of analysis of plaintiffs' status as public figures); *Gaunt v. Pittaway*, 534 S.E.2d 660, 665 (N.C. Ct. App. 2000) (plaintiff "thrust himself into the vortex of the controversy" and thus became limited-purpose public figure by, *inter alia*, "procur[ing] the services of a public relations agent to enhance his public image"); *Merco Joint Venture v. Kaufman*, 923 F. Supp. 924, 927 (W.D. Tex. 1996) (defamation plaintiff "meets the

13

requirements of the *Gertz* test by virtue of its public relations campaigns"); *Southern Air Transp., Inc. v. Post-Newsweek Stations, Fla., Inc.*, 568 So. 2d 927, 928 (Fla. Ct. App. 1990) (plaintiff was public figure in part because it "hired a public relations firm and attempted to influence the outcome of the [relevant] public controversy").

In this case, the facts about the Vicinis' lobbying activities are especially pertinent to establishing (a) the existence of a public controversy at the time the Film was published, (b) the Vicinis' efforts to influence the resolution of that controversy, and (c) their ability to respond effectively to the allegedly false implications about them in the Film.[10]  Brand plainly possesses information that bears on these central contested issues, and defendants are entitled to his testimony and documents in order to create a proper record for the trial court.

Like his claims of irrelevance and interference with the attorney-client relationship, Brand's remaining objections to the subpoena are equally baseless. *See* Koch Decl., Ex. 6 at 2-3. As noted above, the subpoena expressly calls for only *nonprivileged* materials and, in any event, Brand has not identified the nature of any responsive documents that may be privileged, as required by Rule 45(d)(2).  His further objection that the definitions of "Lobbying Services" and "The Vicinis" are vague and overly broad are similarly rebutted by the Subpoena itself, which limits responsive documents to those relating to communications with federal executive or

---

[10] Even if discovery were to show that Brand's lobbying efforts on the Vicinis' behalf did not commence until around the time of the Film's premiere in the spring of 2007, those activities are nonetheless probative of the Vicinis' access to the channels of effective communication and the existence of a prior public controversy. *Lohrenz v. Donnelly*, 350 F.3d 1272, 1282 (D.C. Cir. 2003) (interview post-dating publications relevant to public figure analysis); *OAO Alfa Bank v. Ctr. for Public Integrity*, 387 F. Supp. 2d 20, 45 (D.D.C. 2005) (press coverage "soon after the date of publication" considered in determining pre-existence of public controversy surrounding plaintiffs and their companies); *Foretich v. Advance Magazine Publishers, Inc.*, 765 F. Supp. 1099, 1108 (D.D.C. 1991) (statement germane to public controversy where co-plaintiff publicly discussed incident "[o]n several occasions over the years, both before and after publication"). Indeed, it appears from Brand's white paper – which nowhere mentions *The Price of Sugar* – that the Vicinis' lobbying efforts were in fact directed at addressing criticisms of their labor practices that long pre-dated the Film's production and release. *See* Koch Decl., Ex. 1.

legislative officials on behalf of the Vicinis themselves or the sugar businesses they own or control; it is a single request that is both specific and narrow and should not be at all burdensome for a firm such as Patton Boggs to handle.[11]  Moreover, the temporal breadth of the subpoena – five years – is hardly exceptional given that it coincides with the events depicted in the Film and the dates for which the Vicinis have sought discovery from Movants in the Litigation.  Finally, the assertion that "the deposition requested is unreasonably cumulative and duplicative of the document requests propounded in the Subpoena," is patently ridiculous given that Brand has refused to provide any of the documents requested and that the one responsive document Movants independently obtained – Brand's email transmitting his "white paper," *see* Koch Decl., Ex. 1 at STATE-D001 – describes a meeting between State Department officials and the Vicinis' lobbyists for which there is almost certainly no transcription that could substitute for testimony.

Brand's blanket refusal to provide evidence germane to the issues in dispute in the Litigation has materially impaired Movants' ability to prepare their defense.  Movants therefore respectfully request that the Court enter an order requiring Brand to forthwith produce all materials responsive to the Subpoena in his possession, custody or control and to appear for a deposition promptly after completing that production.

> C.    Brand's Refusal To Appear for Deposition Is Contemptuous and Sanctionable.

All apart from the foregoing, Brand's failure to appear for the deposition as commanded by the Subpoena, and without having obtained – or even *sought* – relief from that obligation, was "without adequate excuse" and constitutes grounds for a finding of contempt.  *See* FED. R. CIV. P. 45(e).  *See also, e.g.*, 9A WRIGHT & MILLER § 2465 ("failure of a subpoenaed party to attend

---

[11] To the extent this objection is based on a claim that there is a material distinction between lobbying activities by Vicini-owned companies and lobbying activities by the Vicinis in their supposed "individual capacities," that is a merits argument that is properly made in the Litigation; it is not a basis for denying Movants discovery about, *inter alia*, the Vicinis' personal involvement in their sugar companies' government relations efforts.

[a deposition] or produce according to the terms of a subpoena is *prima facie* evidence of contempt"); *Am. Honda Motor Co. v. Motorcycle Info. Network, Inc.*, No. 5:04-cv-12, 2006 WL 1063299, at *1 (M.D. Fla. Mar. 28, 2006) (Rule 45 provides "for the imposition of sanctions against a non-party for failure to comply with a subpoena").

It is axiomatic that deponents are "obliged to appear until some order of the court excuses attendance." *Barnes v. Madison*, 79 Fed. App'x 691, 707 (5th Cir. 2003). *Cf. Batt v. Kimberly-Clark Corp.*, 438 F. Supp. 2d. 135, 1318 (N.D. Okla. 2006) (deponent "required to take some action to stay the deposition until the parties, with or without the Court's assistance, could resolve the dispute"). Indeed, even if the deponent moves to quash the subpoena or for a protective order prior to the deposition (which Brand did not do here), it is incumbent upon that deponent to at least obtain an order staying the discovery pending resolution of the motion. *See Goodwin v. City of Boston*, 118 F.R.D. 297, 297 (D. Mass. 1988). What is clearly improper is what Brand did here: simply notifying the subpoenaing party that the deponent "will not be made available for deposition on [the noticed date], or on any other date absent a court order," and then failing to appear. *See* Koch Decl., Ex. 6 at 3. Such willful defiance of a subpoena is contemptuous – especially when, as here, the deponent is a member of the Bar.

Furthermore, to the extent Brand may attempt to claim attorney-client privilege in response to particular questions at deposition, Brand's tactic of simply not showing up has created inefficiencies and further burdened this Court, which would be called upon to adjudicate any disputes over assertions of privilege. This is why "[i]n the deposition context, as at trial, the objection [of privilege] should ordinarily be asserted when a question seeking privileged material is asked, and the questioner may explore the propriety of the objection with questions going to availability of the privilege," and not on a blanket basis. 8 WRIGHT & MILLER § 2016.1.

Accordingly, Movants further respectfully request that the Court impose on Brand monetary sanctions – including, but not limited to, an award of Movants' attorneys' fees and costs – for his contemptuous and obstructionist behavior.

## CONCLUSION

For the foregoing reasons, Movants respectfully request that the Court compel Brand's immediate and full compliance with the subpoena, require Brand to show cause why he should not be held in contempt, award Movants their attorneys' fees and costs incurred in connection with this motion, and/or provide such other relief as the Court deems appropriate.

Dated:  August 11, 2008

Respectfully submitted,

LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.

By: _____
Elizabeth C. Koch
Thomas Curley
John B. O'Keefe, D.C. Bar No. 974892
1050 Seventeenth Street, N.W., Suite 800
Washington, DC  20036
Telephone:  (202) 508-1100
Email:  jokeefe@lskslaw.com

*Counsel for Movants/Defendants*

# Exhibit 1

**Min, Royce B**

| | |
|---|---|
| **From:** | Brand, Joseph [JBrand@pattonboggs.com] |
| **Sent:** | Friday, June 29, 2007 2:27 PM |
| **To:** | Bryan, Alexander T; Wheeler, Stephen; meigsm@state.gov |
| **Cc:** | Searby, David P |
| **Subject:** | Vicini |
| | |
| **Categories:** | Blue Category |
| **Attachments:** | WASHINGTON-#4892972-v2-Vicini_White_Paper.DOC$; WASHINGTON-#4893498-v1-Vicini_Leave_Behind.DOC$ |

 

WASHINGTON-#48  WASHINGTON-#48
92972-v2-Vicini_...  93498-v1-Vicini_...

Gentlemen:

When we met on May 29 I mentioned that I was preparing a white paper on the facts of the Vicini sugar operation as they relate to the Haitian migrants' issue.  I attach our white paper and our "leave behind."  If my facts are incorrect in any way, I would appreciate hearing from you.

Thanks, Joe

   <<WASHINGTON-#4892972-v2-Vicini_White_Paper.DOC$>>
   <<WASHINGTON-#4893498-v1-Vicini_Leave_Behind.DOC$>>

Joseph L. Brand
Patton Boggs LLP
2550 M Street, NW
Washington, DC 20037
Office:        1-202-457-6035
Mobile:    1-202-413-6035
Fax:           1-202-530-2869
jbrand@pattonboggs.com

DISCLAIMER:
This e-mail message contains confidential, privileged information intended solely for the addressee.  Please do not read, copy, or disseminate it unless you are the addressee.  If you have received it in error, please call us (collect) at (202) 457-6000 and ask to speak with the message sender.  Also, we would appreciate your forwarding the message back to us and deleting it from your system.  Thank you.

This e-mail and all other electronic (including voice) communications from the sender's firm are for informational purposes only.  No such communication is intended by the sender to constitute either an electronic record or an electronic signature, or to constitute any agreement by the sender to conduct a transaction by electronic means.  Any such intention or agreement is hereby expressly disclaimed unless otherwise specifically indicated.  To learn more about our firm, please visit our website at http://www.pattonboggs.com.

STATE-D001

## Haitian Migrant Workers in the Dominican Republic:
### The Facts about the Vicinis

The Vicini family, one of the Dominican Republic's sugar producers, has been criticized for treatment of Haitian migrant workers in the Dominican Republic. This criticism is misdirected. The Vicini family, operators of the Consosrcio Azucarero de Empresas Industriales ("CAEI"), has instituted -- and is continuing to implement -- reforms which place its operations as the industry leader. This paper sets out, on the left-hand side, criticism of and observations about the Haitian migrant problem in the Dominican Republic, sometimes directed to the sugar industry in the country, sometimes to the Vicinis or CAEI. These statements come from departments of the U.S. government and main-stream non-governmental organizations. The source of each statement is identified. On the right-hand side, we provide facts relevant to each statement. Often these facts come from a U.S government or NGO publication and where they do we cite to sources. Many of the criticisms, while justified, target the government of the Dominican Republic, not the Dominican sugar industry and not the Vicinis. Other information on the right-hand describes improvements the Vicinis are now making.

For further information, please contact Joseph L. Brand, Aubrey Rothrock, Stephanie Peters, or Scott Thompson at Patton Boggs LLP. 202-457-6000.

| Statement | Comment |
|---|---|
| **Trafficking** | **Trafficking** |
| *The State Department's 2006 Country Report on Human Rights Practices section on the Dominican Republic reports that "severe discrimination against Haitian migrants and their descendants, trafficking in persons, and a disregard of fundamental labor rights still continued to be issues."*[1] | **These issues relate to the overall problem of the 700,000 to 1,000,000 Haitian immigrants who are living in the Dominican Republic (this estimate comes from the American Embassy in Santo Domingo) and not just to the 10,000 sugarcane harvesters working in the sugar industry. This report describes actions taken by the Vicinini's sugar industry company Consorcio Azucarero de Empresas Industriales ("CAEI") to eliminate trafficking of Haitian migrants and improve the situation of those who now work at CAEI.** |
| *State's 2007 Trafficking in Persons ("TIP") report drops the Dominican Republic from Tier 2 to Tier 2 Watch List for its failure to undertake "vigorous actions to counter official complicity with trafficking activity."* | **Neither CAEI nor the sugarcane industry is mentioned in the 2007 TIP report. Officials at the American Embassy in Santo Domingo report that the extant trafficking does not involve the sugarcane industry. CAEI does not employ new Haitian migrants and has not since February of 2006.**<br><br>**The Haitians currently trafficked to the Dominican Republic are employed largely** |

| Statement | Comment |
|---|---|
| | as sex workers, construction workers, and in some cases as agricultural workers, but not in the sugarcane industry. The government's own subway program in Santo Domingo is a big draw for Haitian migrants. |
| *State's 2006 human rights report did mention the sugarcane industry, as follows: "There were conflicting reports that sugarcane plantations around the country had ceased the practice of transporting new undocumented workers from Haiti. Such workers traditionally played a crucial role in the sugar industry, but were forced to live in conditions that were described as modern-day slavery. The apparent discontinuation of this practice was attributed to government crackdowns on Haitian immigration, investment by private sugar producers in mechanization, and the cessation of large-scale cane harvesting on government-owned plantations. However, at year's end there were allegations that some employers, specifically the Vicini Corporation, had resumed the practice of importing undocumented workers for the sugar fields."* | **The practice has ceased and the allegation that "the Vicini Corporation had resumed the practice of importing undocumented workers" is without foundation in fact. All of the 1,340 Haitians who currently work for CAEI were employed by CAEI in the previous year. No new Haitian migrants have been hired since February 2006. There are already more Haitians than the sugar industry needs – only 10,000 of approximately 700,000 to 1,000,000 Haitian migrants work in the sugar industry, which amounts to approximately 1% of the total.**<br><br>**Mechanization will replace most of the migrant workers. Currently, 40% of CAEI sugarcane is mechanically harvested. CAEI's goal is to use mechanical harvesting on all its properties where the terrain will permit the use of machinery. CAEI estimates that 90% of its sugarcane fields will eventually be mechanically harvested.** |

## Nationality Status

| | |
|---|---|
| *In March 2006, Amnesty International addressed a letter to Dominican Republic President Leonel Fernández Reyna denouncing the expulsion of Haitians and highlighting a September 2005 ruling from the Inter-American Court of Human Rights (Dilcia Yean and Violeta Bosico v. Dominican Republic) that "affirmed the human right to a nationality."[2]*<br><br>*Amnesty International's Annual 2007 Report[3] addressed the tenuous status of migrant workers with the following statement: "The majority of Haitian migrant workers in the Dominican Republic are believed to be in an irregular situation; that is, they do not have legal permission to remain in the country. Some may have entered the country legally,* | **The American Embassy in Santo Domingo reports that President Fernandez ordered an end to the Dominican army's forced expulsion of Haitian immigrants.**<br><br>**The right to nationality is a fundamental human right recognized in international instruments going back to the 1948 Universal Declaration of Human Rights which proclaims in its Article 15: "Everyone has a right to a nationality."**<br><br>**This is a public policy issue to be addressed by the sovereign governments of the Dominican Republic and Haiti. There is nothing a private company like CAEI can do about it.** |

STATE - D003

| Statement | Comment |
|---|---|
| but have become irregular migrants because their status has changed over time.  Irregular migrant workers are at heightened risk of exploitation and human rights abuses by employers or other non-state agents as well as by state officials.  Their lack of legal status makes it extremely difficult for them to assert their rights or to seek redress for abuses."<br><br>Amnesty continues to press the issue. Its February 2007 report entitled "Dominican Republic: A life in Transit – The Plight of Haitian Migrants and Dominicans of Haitian descent," observes "that the way in which immigration laws and policies are being implemented is inconsistent with international human rights standards."<br><br>The issue of national status of the 700,000 to 1,000,000 Haitian migrants in the Dominican Republic is a major human rights concern of the U.S. government. | |
| ## Birth Registration<br><br>The two Dominican Republic human rights of greatest concern to the U.S. government are national status and birth registration.  State's 2006 TIP frames the birth registration issue: "The government continues to deny birth certificates to Haitians born in the Dominican Republic, which leaves them more vulnerable to traffickers and also leaves them without access to certain services in the Dominican Republic."⁴<br><br>Several NGOs (The International Human Rights Law Clinic at the University of California Berkeley Law School, the Center for Justice and International Law, and the Association of Women of Haitian Descent) brought the issue before the Inter-American Court of Human Rights in Dilcia Yean and Violeta Bosico v. Dominican Republic.<br><br>Refugees International presses the issue with statements on its website such as the following: "An estimated two to three million individuals, 20-25 percent of people residing in the Dominican Republic, are not documented. | ## Birth Registration<br><br>**The birth registration issue is a major public policy matter for the sovereign government of the Dominican Republic and has been, and still is, one of intense public debate.  It was the subject of a 2004 law (Ley General par alas Migraciones, No. 285-04) and a more recent Supreme Court decision   The law in Article 28 provides that "Non-resident foreign women who, during their stay in the country, give birth to a child, must go to the Consulate of their nationality for the purpose of registering the child."**<br><br>**The Dominican Republic's Supreme Court upheld the law.**<br><br>**The Dominican government is responsible for the adoption of laws and the implementation of policies in this area.  A private company like CAEI has no role in the process.** |

STATE - D004

| Statement | Comment |
|---|---|
| *Among them are up to one million individuals of Haitian origin."*[5] | |

## Haitian Migrant Workers in the Sugar Industry

*Amnesty International described the employment of Haitian migrants in its 2007 Annual 2007 Report*[6] *as follows: "The Dominican agricultural sector relies heavily on Haitian migrant workers, most of whom are in an irregular situation even if at the time of contracting them they had a seasonal work permit. In the sugarcane industry, for example, Haitian migrant workers make up 90 per cent of the labour force. The vast majority are employed cutting cane which is the most arduous job in the industry."*

*Earlier this year, Amnesty International published "Dominican Republic: A life in Transit – The Plight of Haitian Migrants and Dominicans of Haitian Descent," which stated: "Private and nationalized sugar plantations depend on the large pool of Haitian workers who are paid derisory wages and are subjected to the kind of appalling working conditions that most Dominicans are not prepared to accept."*

## Refugees

*State's 2006 TIP report calles attention to the fact that the Dominican Republic government "did not apply standards agreed upon with the office of the UN High Commissioner for Refugees (UNHCR) to improve receipt and adjudication of refugee claims. The UNHCR withdrew its personnel from Santo Domingo in July 2005 and subsequently monitored migration and refugee issues from a regional office outside the country."*

---

## Haitian Migrant Workers in the Sugar Industry

**This report may give the false impression that there is an annual migration of many, many Haitians to work in the Dominican sugarcane fields. That is not the case. There are of course many Haitian migrants in the Dominican Republic, but only a small fraction of them work in the sugar industry. By actual count, CAEI employs only 1,340 sugarcane workers; 90% of these are Haitians. CAEI's sugar mills employ 420 sugar mill workers; 10% of these are Haitians.**

**The annual Presidential decree requiring that 85% of an industry's labor force be Dominican specifically excludes the sugar industry, among others.**

**Poverty is widespread in the country and is common to many Dominicans as well as to the Haitian migrant population. According to USAID, Haiti, with a per capital income of less than $400, is the poorest country in the Western hemisphere. By comparison, the island-sharing neighbor of the Dominican Republic, with its IMF-reported economy of $30 billion, offers a solid, stable, growing economy -- an attraction for many Haitians who migrate there to work.**

## Refugees

**The receipt and adjudication of refugee claims is a matter for the sovereign government of the Dominican Republic. A private company like CAEI has no authority over or responsibility for these issues.**

STATE - D005

| Statement | Comment |
|---|---|
| **Forced Labor**<br><br>*State's 2006 human rights report on the Dominican Republic discusses the Dominican law on forced labor: "The law prohibits forced or compulsory labor, and there no longer were reports that it occurred. In previous years, managers regularly prohibited workers on sugarcane plantations from leaving during the harvest, but it appeared that this was no longer the case."*<br><br>*State's comment is contradicted by a press statement posted on the Port-au-Prince, Haiti U.S. Embassy website June 2006: "There is also cross border human trafficking between Haiti and the Dominican Republic. ... Haitians are trafficked to the Dominican Republic for forced labor. ... Haiti is also source and transit country of illegal migration."* | **Forced Labor**<br><br>**CAEI's 1,340 Haitian workers are at will employees and are free to leave CAEI's employment at any time of their choosing. They generally work 12 months each year, 6 months harvesting (for which they are paid weekly in cash based on the weight of cane cut) and 6 months engaged in field work, such as planting and fertilizing (for which they are paid according to a set tariff for each task).**<br><br>**CAEI has hired no new Haitian migrant workers since the signing of an agreement with the Dominican Republic's Secretary of Interior in February 2006.** |
| **Child Labor**<br><br>*The Department of Labor's 2005 Findings on the Worst Forms of Child Labor Report contains the following information about the Dominican Republic': "An estimated 14.5 percent of children ages 5 to 14 years were counted as working in the Dominican Republic in 2000.... A Secretariat of Labor (SET) study estimated that 41 percent of working children ages 5 to 17 worked in services, 21 percent in commerce, 19 percent in agriculture, and 11 percent in manufacturing industries during 2000.... In rural areas children work mostly in agriculture and services. Most child agricultural workers are boys.... Haitian and Dominican children plant and cut sugarcane in the Dominican Republic.... It has been reported that some sugarcane workers, possibly including children, work under conditions of forced labor where they are denied access to their clothing, property, and wages."* | **Child Labor**<br><br>**CAEI does not employ children and has an official "zero tolerance" policy on the issue. CAEI also supports the program to eradicate child labor of Vice President Rafael Albuquerque and first lady Margarita Cedeno de Fernández.**<br><br>**In 2006, CAEI set forth its zero tolerance policy in a formal memorandum for all of its sugar holdings. CAEI's mills at San Cristóbal and San Pedro de Macorís do not purchase sugarcane from independent growers who use child labor and enforce this policy by on-site investigations.**<br><br>**The Dominican government has established the national minimum wage. CAEI then sets the prevailing wage on its property after reaching agreement with the several labor unions representing the sugarcane workers.** |

STATE - D006

| Statement | Comment |
|---|---|
| **Bateyes**<br><br>*State's 2006 TIP report[8] states: "Haitians are trafficked into the Dominican Republic to work in the sugarcane industry in shantytowns, referred to as "bateys." The conditions in the bateys are substandard; in some bateys, armed guards reportedly kept workers' clothes and documents."* | **Bateyes**<br><br>**Forty-three bateyes exist on CAEI lands. No armed guards are employed to impose control in any CAEI sugarcane property, including the bateyes. Local law enforcement and the Dominican army both patrol the bateyes.**<br><br>**The bateyes on CAEI properties in general are above the standard for the industry in the Dominican Republic. Many of the existing housing structures on CAEI land are concrete, whereas in other bateyes most of the homes are wooden and are prone to destruction during hurricane seasons.**<br><br>**CAEI has recently committed a capital expenditure of US$6 million to begin consolidating all forty-three of the existing bateyes into four modern living communities where workers will be able to live in their own homes through an "earn-out" program. CAEI is working with local and international NGOs to create these new communities. They will have running water, electricity and a sewage system.** |
| **Worker Conditions in the Bateyes**<br><br>*The Labor Department's child labor report describes conditions in the bateyes:[9] "Conditions for agricultural workers were poor, particularly in the sugar industry. Most bateyes lacked schools, medical facilities, running water, and sewage systems and had high rates of disease. Company-provided housing was sub-standard…. Most sugarcane workers were Haitian or of Haitian descent. In some bateyes, employers withheld a portion of wages to ensure that workers returned to the fields for the next season's harvest. Sugarcane workers often did not receive medical services or pensions due them even though deductions were taken from their pay."* | **Worker Conditions in the Bateyes**<br><br>**The sugar industry is the only industry in the Dominican Republic, rural or urban, that provides free, on-site housing. CAEI's bateyes currently house not only CAEI sugarcane workers and their families but also Dominicans and Haitian migrants not employed by CAEI.**<br><br>**Facilities at the CAEI bateyes are above industry standard and are continuously being improved. Schooling and medical facilities are provided at many of the bateyes, as is potable water. CAEI's US$6 million dollar capital expenditure program will fund the design and construction of a modern housing community that will consolidate the housing on the existing forty-three CAEI bateyes.** |

STATE -D007

| Statement | Comment |
|---|---|
| | The Instituto Domincano de Desarrollo Integral, IDDI, a non-governmental organization, currently working with CAEI to assist in social and economic improvements within the sugarcane communities of Casa Vicini, carries this message on its website: "In November 2002 IDDI and Casa Vicini, the consortium that owns four sugar mills in the Dominican Republic, signed an agreement to develop the communities that exist in the areas around the sugar mills. This agreement includes the construction of schools, community centers, HIV/AIDS prevention, primary health care, income generation, education and other similar activities."[14]

CAEI is also engaged in supporting educational programs with NGOs (for example, EDUCA, a local NGO, which has enrolled 3,000 Haitian and Dominican children in schools in the past five years, and FUDECO, an affiliate of Save the Children, which is assisting with the improvement of the schools, housing and overall improvement of the communities in the CAEI bateyes. |
| "The Dominican Social Security Institute (IDSS) sets workplace safety and health conditions. Both the IDSS and the Ministry of Labor had a small corps of inspectors charged with enforcing standards. The Secretariat of Labor had 185 active inspectors. Inspector positions customarily were filled through political patronage, and inspectors typically took bribes from businesses. Workers complained that inspectors were not trained and did not respond to health and safety complaints. While the law requires that employers provide a safe working environment, in practice workers could not remove themselves from hazardous working situations without losing their jobs." | CAEI provides its workers, both Haitian and Dominican, with protective equipment as required by law (and negotiation with the unions) and subject to inspection by government authorities. Machetes, gloves and boots are provided to sugarcane workers.

The government regulates the agriculture industry's workforce. Sugarcane workers generally work six or seven days a week and are paid based upon the amount as determined by weight of the sugarcane harvested. There are no restrictions on the number of breaks, or the number of leave days, a worker may take. CAEI maintains a daily log of all of the sugarcane harvesters who report for work each day and does not withhold wages. |
| The Health Justice Collaborative, a NGO, reports the following batey | Ninety percent of the sugarcane workers on CAEI properties are Haitian. Of CAEI's |

STATE-D008

| Statement | Comment |
|---|---|
| *demographics/statistics on their website:*<br><br>• *90% of the sugarcane cutters are Haitian or of Haitian descent.*<br><br>• *6% percent report being born in Haiti, the majority of batey residents are second or third generation Haitians or Haitian-Dominicans born in the DR.*<br><br>• *97.5% of inhabitants live in the batey year-round.* [10] | **1,340 Haitian sugarcane workers, the 6% figure of Haitian- born is probably low. CAEI reports that 100% of the inhabitants of the bateyes live there year-round.** |
| <u>Education in the Bateyes</u><br><br>*In 2005 the UN Development Programme (UNDP) report on human development in the Dominican Republic stated that "16 per cent of the bateyes under the State Sugar Council, (Consejo Estatal del Azucar) do not receive medical assistance and only seven per cent have a dispensary or rural clinic. Two-thirds of those living in bateyes do not have access to any sanitation infrastructure and half get their water directly from the rivers." The UNDP report also noted that in nearly one-third of bateyes there is no formal educational provision for the children living there. "It is estimated that a third of those living in these communities cannot read or write." [11]* | <u>**Education in the Bateyes**</u><br><br>**Of the forty-three bateyes on CAEI property, thirteen have medical clinics and twenty-six have schools. Sanitation is provided in the form of latrines. Water is paid for by CAEI and provided by tanks. Education in the CAEI bateyes is improving, but this must be seen in the context that the quality of the Dominican Republic's public school system ranks 124 out of 125 countries surveyed in the <u>Global Competitiveness 2006-2007 Report</u>. By comparison, there is no publicly-funded education in Haiti.** |
| <u>Payment of Haitian Migrant Workers</u><br><br>*The Labor Department's report finds that [12] "On sugar plantations, cane cutters usually were paid by the weight of cane cut rather than the hours worked. Observers suspected fraud at some weighing stations and noted that employers sometimes did not provide trucks or carts to transport the newly cut cane at the end of the workday, causing workers to receive lower compensation because the cane dried out overnight and weighed less. The amount of cane a worker could cut varied, but many cane cutters earned less than $2.50 (75 pesos) per day."* | <u>**Payment of Haitian Migrant Workers**</u><br><br>**CAEI provides cane carts for the harvesting of sugar cane on their properties. Cane cutters are free to monitor the weigh-in of their cane, and are encouraged to immediately weigh their fresh cut cane as dried out cane ultimately results in a net loss to the company.**<br><br>**The average cane cutter earns DOP$105 [US$3.26] [13] per ton harvested. This is nearly double the amount paid by some other sugar mills. CAEI pays workers on a weekly basis and offers incentives at Christmas and at the end of the harvesting season, beyond the government's labor law requirements.** |

- 8 -

STATE - D009

| Statement | Comment |
|---|---|
| | The Dominican government establishes the national minimum wage. CAEI then sets the prevailing wage on its property after reaching agreement with the several labor unions representing the sugarcane workers. |
| **Legal Redress** | **Legal Redress** |
| *Amnesty International, in its Annual 2007 Report,[13] described the situation of Haitian migrant workers and their inability to obtain legal redress: "Most irregular migrant workers are reluctant to turn to the authorities to enforce respect for their rights, and are generally fearful of drawing official attention to themselves and so risking deportation to Haiti. Rights in the workplace are virtually non-existent for most of them." The Report went on to say: "Given this ever-present risk of dismissal and deportation, migrant workers often consider they have no choice but to accept poor working conditions and are less likely to seek to exercise their rights fully including their rights at the work place. Haitian migrant workers live in precarious conditions, marginalized and in extreme poverty. Moreover, outside the bateyes they have to confront political and social attitudes that are generally hostile to them without the possibility of redress for the abuses suffered."* | Haitian migrants have legal standing to bring civil actions and to refer criminal matters to the authorities and they often do so. By contrast, The Haiti legal system is described by the Organization of American States in a special report entitled, *"Haiti: Failed Justice or the Rule of Law? Challenges Ahead for Haiti and the International Community,"[16]* as failing to provide a forum for redress of human rights violations within Haiti.<br><br>Sugarcane industry employers have been defendants in civil actions brought by Haitian migrants in the Dominican Republic. But because the Dominican judicial system is perceived to be corrupt, poor migrant laborers might be intimidated. Transparency International ranks the Dominican Republic 99 out of 163 countries surveyed in its 2006 Corruption Perceptions Index. (Haiti is ranked 163). The Dominican judiciary sector is ranked as one of the most corrupt of 14 sectors TI reports on in its 2006 Global Corruption Barometer |

---

[1] U.S. State Department 2005 Country Report on Human Rights Practices, available at: http://www.state.gov/g/drl/rls/hrrpt/2005/61725.htm

[2] Amnesty International letter from Irene Khan to Dominican Republic President Leonel Fernández Reyna (8. March 2006), available at: http://web.amnesty.org/library/pdf/AMR270012006ENGLISH/$File/AMR2700106.pdf

[3] Amnesty International 2007 Report on the Dominican Republic, available at: http://web.amnesty.org/library/Index/ENGAMR270012007?open&of=ENG-DOM

[4] The U.S. State Department's 2006 Trafficking in Persons (TIP), available at: http://www.state.gov/g/tip/rls/tiprpt/2006/

STATE - D000

[5] Refugees International article, Dominican Republic, Haiti, and the United States: Protect Rights, Reduce Statelessness (11. January 2007), available at:
http://www.refugeesinternational.org/content/article/detail/9770/

[6] Id.

[7] The U.S. Department of Labor's 2005 Findings on the Worst Forms of Child Labor, available at:
http://www.dol.gov/ilab/media/reports/iclp/main.htm

[8] The U.S. State Department's 2006 Trafficking in Persons (TIP), available at:
http://www.state.gov/g/tip/rls/tiprpt/2006/

[9] Id.

[10] The Health Justice Collaborative website, available at http://www.thehjc.org/batey_references.html

[11] Amnesty International 2007 Report on the Dominican Republic, available at:
http://web.amnesty.org/library/Index/ENGAMR270012007?open&of=ENG-DOM

[12] Id.

[13] Id.

[14] Instituto Domincano de Desarrollo Integral website, available at:
http://www.iddi.org/English/Friends/friends.html

[15] Currency converter tool, available online at: http://coinmill.com/DOP_USD.html

[16] Annual Report of the Organization of American States' Inter-American Commission on Human Rights, available at: www.cidh.org

STATE - DO#1

## Haitian Migrant Workers in the Dominican Republic:
## The Facts about the Vicinis

The Vicini family, one of the Dominican Republic's sugar producers, has been criticized for treatment of Haitian migrant workers in the Dominican Republic. This criticism is misdirected. The Vicini family, operators of the Consosrcio Azucarero de Empresas Industriales ("CAEI"), has instituted reforms which should be applauded, but the Dominican Republic government has failed to address some of the problems of Haitian migrant workers.

Please note the following important facts about the Vicini's sugar operations:

- *Only 1,340 Haitian migrant workers are employed by the Vicinis.* There are 700,000 to 1,000,000 Haitian migrant workers in the Dominican Republic. The Vicinis employ a very small fraction of that number.

- *No new Haitian migrants have been employed by the Vicinis this year and no new Haitian migrants will be employed in the future.* On February 24, 2006 the Vicinis entered into a formal undertaking with the immigration authorities to this effect.

- *$6,000,000 has been committed by the Vicinis to improve the bateyes*, the villages where the migrant sugarcane workers live.

- *The Vicinis are ahead of the governments in alleviating the trafficking situation.* The Dominican Republic was just placed on the State Department's Tier 2 Watch List and the Haitian government is still a "special case" on trafficking issues. The Vicinis, meanwhile, are not hiring new Haitian immigrants and are improving the lot of those now employed.

- *More needs to be done and the Vicinis are doing it.* The Vicinis are working with local NGOs to improve housing and education in the 43 bateyes on its property. Twenty-six of these bateyes now have schools which are educating 3,000 Haitian children. The Vicinis have introduced mechanical harvesting on 40% of its sugar fields and have plans to increase this to the maximum extent permitted by the topography.

For further information, contact Joseph L. Brand, Aubrey Rothrock, Stephanie Peters, or Scott Thompson at Patton Boggs LLP.
202-457-6000.

CTATE - DOI2

# Exhibit 2

| Clerk of the House of Representatives<br>Legislative Resource Center<br>B-106 Cannon Building<br>Washington, DC 20515 | Secretary of the Senate<br>Office of Public Records<br>232 Hart Building<br>Washington, DC 20510 | Secretary of the Senate<br>Received: Aug 12, 2007 |
|---|---|---|

# LOBBYING REPORT

Lobbying Disclosure Act of 1995 (Section 5) - All Filers Are Required To Complete This Page

**1. Registrant Name:**

**PATTON BOGGS LLP**

**2. Address:**
2550 M STREET, NW, WASHINGTON, DC 20037

**3. Principal place of business (if different from line 2):**

**4. Contact Name:** JAMES B. CHRISTIAN
Telephone: 2024576494
E-mail (optional): LDAdmins@pattonboggs.com

Senate ID #: 30906-1002674
House ID #: 31917

**7. Client Name:** ☐ Self

COMPANIA ANONIMA DE EXPLOTACIONES INDUSTRIES

## TYPE OF REPORT

8. Year  2007          Midyear (January 1 - June 30): ☒  OR  Year End (July 1 - December 31): ☐

9. Check if this filing amends a previously filed version of this report: ☐

10. Check if this is a Termination Report: ☐ ⇒ Termination Date:                    11. No Lobbying Activity: ☐

## INCOME OR EXPENSES

Complete Either Line 12 OR Line 13

**12. Lobbying Firms**

    **INCOME** relating to lobbying activities for this reporting period was:

        Less than $10,000: ☐

        $10,000 or more: ☒ ⇒ Income (nearest $20,000)  60,000.00

Provide a good faith estimate, rounded to the nearest $20,000, of all lobbying related income from the client (including all payments to the registrant by any other entity for lobbying activities on behalf of the client).

**13. Organizations**

    **EXPENSES** relating to lobbying activities for this reporting period were:

        Less than $10,000: ☐

        $10,000 or more: ☐ ⇒ Expenses (nearest $20,000):

    **14. Reporting Method.**
    Check box to indicate expense accounting method. See instructions for description of options.

    ☐ **Method A.** Reporting amounts using LDA definitions only
    ☐ **Method B.** Reporting amounts under section 6033(b)(8) of the Internal Revenue Code
    ☐ **Method C.** Reporting amounts under section 162(e) of the Internal Revenue Code

Page 1

Registrant Name: PATTON BOGGS LLP Client Name: COMPANIA ANONIMA DE EXPLOTACIONES
INDUSTRIES
## LOBBYING ACTIVITY.
Select as many codes as necessary to reflect the general issue areas in which the registrant engaged in lobbying on behalf of the client
during the reporting period. Using a separate page for each code, provide information as requested. Attach additional page(s) as
needed.

15. General issue area code:  AGR   (one per page)

16. Specific lobbying issues:

Labor issues in the Dominican Republic.

17. House(s) of Congress and Federal agencies contacted:
HOUSE OF REPRESENTATIVES
Labor, Dept of (DOL)
SENATE
State, Dept of (DOS)

18. Name of each individual who acted as a lobbyist in this issue area:

Name:  BRAND, JOSEPH L.
    Covered Official Position (if applicable):  N/A
Name:  MCCAFFREY, READ
    Covered Official Position (if applicable):  N/A
Name:  PETERS, STEPHANIE
    Covered Official Position (if applicable):  N/A
Name:  ROTHROCK, AUBREY
    Covered Official Position (if applicable):  N/A
Name:  THOMPSON, SCOTT
    Covered Official Position (if applicable):  N/A

19. Interest of each foreign entity in the specific issues listed on line 16 above. None

| Clerk of the House of Representatives | Secretary of the Senate | |
|---|---|---|
| Legislative Resource Center | Office of Public Records | Secretary of the Senate |
| B-106 Cannon Building | 232 Hart Building | Received: Feb 08, 2008 |
| Washington, DC 20515 | Washington, DC 20510 | |

# LOBBYING REPORT

Lobbying Disclosure Act of 1995 (Section 5) - All Filers Are Required To Complete This Page

**1. Registrant Name:**

## PATTON BOGGS LLP

**2. Address:**
2550 M STREET, NW, WASHINGTON, DC 20037

3. Principal place of business (if different from line 2):

**4. Contact Name:** JAMES B. CHRISTIAN
Telephone: 2024576484
E-mail (optional): LDAdmins@pattonboggs.com

Senate ID #: 30906-1002874
House ID #: 31917

**7. Client Name:** ☐ Self

### COMPANIA ANONIMA DE EXPLOTACIONES INDUSTRIES

## TYPE OF REPORT

8. Year ___2007___  Midyear (January 1 - June 30): ☐  OR  Year End (July 1 - December 31): ☒

9. Check if this filing amends a previously filed version of this report: ☐

10. Check if this is a Termination Report: ☐ => Termination Date: _____  11. No Lobbying Activity: ☐

## INCOME OR EXPENSES

Complete Either Line 12 OR Line 13

**12. Lobbying Firms**

    **INCOME** relating to lobbying activities for this reporting period was:

        Less than $10,000: ☐

        $10,000 or more: ☒ => Income (nearest $20,000): ___160,000.00___

Provide a good faith estimate, rounded to the nearest $20,000, of all lobbying related income from the client (including all payments to the registrant by any other entity for lobbying activities on behalf of the client).

**13. Organizations**

    **EXPENSES** relating to lobbying activities for this reporting period were:

        Less than $10,000: ☐

        $10,000 or more: ☐ => Expenses (nearest $20,000): _____

    **14. Reporting Method.**
    Check box to indicate expense accounting method. See instructions for description of options.

        ☐ **Method A.** Reporting amounts using LDA definitions only
        ☐ **Method B.** Reporting amounts under section 6033(b)(8) of the Internal Revenue Code
        ☐ **Method C.** Reporting amounts under section 162(e) of the Internal Revenue Code

Registrant Name: PATTON BOGGS LLP Client Name: COMPANIA ANONIMA DE EXPLOTACIONES
INDUSTRIES
## LOBBYING ACTIVITY.
Select as many codes as necessary to reflect the general issue areas in which the registrant engaged in lobbying on behalf of the client
during the reporting period. Using a separate page for each code, provide information as requested. Attach additional page(s) as
needed.

15. General issue area code: AGR   [one per page]

16. Specific lobbying issues:

Labor issues in the Dominican Republic.

17. House(s) of Congress and Federal agencies contacted:
HOUSE OF REPRESENTATIVES
Labor, Dept of (DOL)
SENATE
State, Dept of (DOS)

18. Name of each individual who acted as a lobbyist in this issue area:

Name:  BRAND, JOSEPH L.
    Covered Official Position (if applicable):  N/A
Name:  MCCAFFREY, READ
    Covered Official Position (if applicable):  N/A
Name:  PETERS, STEPHANIE
    Covered Official Position (if applicable):  N/A
Name:  ROTHROCK, AUBREY
    Covered Official Position (if applicable):  N/A
Name:  THOMPSON, SCOTT
    Covered Official Position (if applicable):  N/A

19. Interest of each foreign entity in the specific issues listed on line 16 above.None

Registrant Name: PATTON BOGGS LLP Client Name: COMPANIA ANONIMA DE EXPLOTACIONES
INDUSTRIES
LOBBYING ACTIVITY.
Select as many codes as necessary to reflect the general issue areas in which the registrant engaged in lobbying on behalf of the client during the reporting period. Using a separate page for each code, provide information as requested. Attach additional page(s) as needed.

15. General issue area code:  FOR    (one per page)

16. Specific lobbying issues:

Labor issues in the Dominican Republic.

17. House(s) of Congress and Federal agencies contacted:
HOUSE OF REPRESENTATIVES
Labor, Dept of [DOL]
SENATE
State, Dept of [DOS]

18. Name of each individual who acted as a lobbyist in this issue area:

Name:  BRAND, JOSEPH L
      Covered Official Position (if applicable):  N/A
Name:  GAVIN, STEPHEN
      Covered Official Position (if applicable):  N/A
Name:  MCCAFFREY, READ
      Covered Official Position (if applicable):  N/A
Name:  PETERS, STEPHANIE
      Covered Official Position (if applicable):  N/A
Name:  ROTHROCK, AUBREY
      Covered Official Position (if applicable):  N/A
Name:  THOMPSON, SCOTT
      Covered Official Position (if applicable):  N/A

19. Interest of each foreign entity in the specific issues listed on line 16 above: None

Signature:  ON FILE      Date: Feb 08, 2008

Printed Name and Title: JAMES B. CHRISTIAN, PARTNER ·

Page 3

Registrant Name: PATTON BOGGS LLP Client Name: COMPANIA ANONIMA DE EXPLOTACIONES INDUSTRIES

**Information Update Page:**
**Complete ONLY where registration information has changed.**

**LOBBYIST UPDATE**
23. Name of each previously reported individual who is NO LONGER expected to act as a lobbyist for the client

**ISSUE UPDATE**
24. General lobbying issues previously reported that NO LONGER pertain

**AFFILIATED ORGANIZATIONS**
25. Add the following organization(s)

26. Name of each previously reported organization that is NO LONGER affiliated with the registrant or client

**FOREIGN ENTITIES**
27. Add the following foreign entities

28. Name of each previously reported foreign entity the NO LONGER owns, OR controls, OR is affiliated with the registrant, client or affiliated organization

Signature: ON FILE    Date: Feb 08, 2008

Printed Name and Title:   .

| Clerk of the House of Representatives<br>Legislative Resource Center<br>B-106 Cannon Building<br>Washington, DC 20515<br>http://lobbyingdisclosure.house.gov | Secretary of the Senate<br>Office of Public Records<br>232 Hart Building<br>Washington, DC 20510<br>http://www.senate.gov/lobby |
|---|---|

# LOBBYING REPORT

Lobbying Disclosure Act of 1995 (Section 5)    **- All Filers Are Required to Complete This Page**

**1. Registrant Name**  ☑ Organization/Lobbying Firm    ☐ Self Employed Individual

### PATTON BOGGS LLP

**2. Address**    ☐ **Check if different than previously reported**

Address1 **2550 M STREET, NW**    Address2

City **WASHINGTON**    State **DC**    Zip Code **20037** -    Country **USA**

**3. Principal place of business (if different than line 2)**

City _____    State _____    Zip Code _____ -    Country _____

**4a. Contact Name**    **b. Telephone Number**  ☐ International Number    **c. E-mail**    **5. Senate ID#**

**James B. Christian**    **(202) 457-6484**    **LDAdmins@pattonboggs.com**    **30906-1002674**

**7. Client Name**  ☐ *Self*    ☐ *Check if client is a state or local government or instrumentality*    **6. House ID#**

**Compania Anonima de Explotaciones Industries**    **319170930**

**TYPE OF REPORT**    **8.** Year **2008**    Q1 (1/1 - 3/31) ☐    Q2 (4/1 - 6/30) ☑    Q3 (7/1-9/30) ☐    Q4 (10/1 - 12/31) ☐

9. Check if this filing amends a previously filed version of this report    ☐

10. Check if this is a Termination Report  ☐    Termination Date _____    11. No Lobbying Issue Activity  ☐

**INCOME OR EXPENSES**  **- YOU MUST complete either Line 12 or Line 13**

| **12. Lobbying** | **13. Organizations** |
|---|---|
| **INCOME** relating to lobbying activities for this reporting period was: | **EXPENSE** relating to lobbying activities for this reporting period were: |
| Less than $5,000  ☐ | Less than $5,000  ☐ |
| $5,000 or more  ☑  $ **$ 80,000.00** | $5,000 or more  ☐  $ _____ |
| Provide a good faith estimate, rounded to the nearest $10,000, of all lobbying related income from the client (including all payments to the registrant by any other entity for lobbying activities on behalf of the client). | **14. REPORTING**    Check box to indicate expense accounting method. See instructions for description of options.<br><br>☐ **Method A.** Reporting amounts using LDA definitions only<br>☐ **Method B.** Reporting amounts under section 6033(b)(8) of the Internal Revenue Code<br>☐ **Method C.** Reporting amounts under section 162(e) of the Internal Revenue Code |

**Signature**    Filed Electronically    **Date**    04/21/2008

**Printed Name and Title**  James B. Christian, Partner

v6.0.1f    Page 1 of 4

| Registrant | PATTON BOGGS LLP | Client Name | Compania Anonima de Explotaciones Industries |
|---|---|---|---|

**LOBBYING ACTIVITY.** Select as many codes as necessary to reflect the general issue areas in which the registrant engaged in lobbying on behalf of the client during the reporting period. Using a separate page for each code, provide information as requested. Add additional page(s) as needed.

15. General issue area code    AGR    AGRICULTURE    (one per page)

16. Specific lobbying issues

Labor issues in the Dominican Republic.

17. House(s) of Congress and Federal agencies    ☐ Check if None

U.S. SENATE, U.S. HOUSE OF REPRESENTATIVES, Labor, Dept of (DOL), State, Dept of (DOS)

18. Name of each individual who acted as a lobbyist in this issue area

| First Name | Last Name | Suffix | Covered Official Position (if applicable) | New |
|---|---|---|---|---|
| Joseph | Brand | | | ☐ |
| Read | McCaffrey | | | ☐ |
| Scott | Thompson | | | ☐ |
| Aubrey | Rothrock | | | ☐ |
| Stephanie | Peters | | | ☐ |
| William | Bright | | RDirSenJudC97-9LASJudAS95-7SASJudTLS93-5RSPL92-3 | ☑ |
| Stacy | Swanson | | | ☑ |
| | | | | ☐ |
| | | | | ☐ |

19. Interest of each foreign entity in the specific issues listed on line 16 above    ☑ Check if None

Printed Name and Title    James B. Christian, Partner

v6.0.1f

Registrant   **PATTON BOGGS LLP**    Client Name   Compania Anonima de Explotaciones Industries

**LOBBYING ACTIVITY.** Select as many codes as necessary to reflect the general issue areas in which the registrant engaged in lobbying on behalf of the client during the reporting period. Using a separate page for each code, provide information as requested. Add additional page(s) as needed.

15. General issue area code  | FOR | FOREIGN RELATIONS | (one per page)

16. Specific lobbying issues

Labor issues in the Dominican Republic.

17. House(s) of Congress and Federal agencies    ☐ Check if None

U.S. SENATE, U.S. HOUSE OF REPRESENTATIVES, Labor Dept of (DOL), State Dept of (DOS)

18. Name of each individual who acted as a lobbyist in this issue area

| First Name | Last Name | Suffix | Covered Official Position (if applicable) | New |
|---|---|---|---|---|
| Joseph | Brand | | | ☐ |
| Read | McCaffrey | | | ☐ |
| Stephen | Gavin | | | ☐ |
| Scott | Thompson | | | ☐ |
| Aubrey | Rothrock | | | ☐ |
| Stephanie | Peters | | | ☐ |
| William | Bright | | RDirSenJudC97-9LASJudAS95-7SASJudTLS93-5RSPL92-3 | ☑ |
| Stacy | Swanson | | | ☑ |
| | | | | ☐ |

19. Interest of each foreign entity in the specific issues listed on line 16 above    ☑ Check if None

**Printed Name and Title**  James B. Christian, Partner

v6.0.1f

Page 3  of 4

| Registrant | PATTON BOGGS LLP | Client Name | Compania Anonima de Explotaciones Industries |
|---|---|---|---|

**Information Update Page - Complete ONLY where registration information has changed.**

20. Client new address

Address

City _____ State _____ Zip Code _____ - _____ Country _____

21. Client new principal place of business (if different than line 20)

City _____ State _____ Zip Code _____ - _____ Country _____

22. New General description of client's business or activities

## LOBBYIST UPDATE

23. Name of each previously reported individual who is no longer expected to act as a lobbyist for the client

| | First Name | Last Name | Suffix | | First Name | Last Name | Suffix |
|---|---|---|---|---|---|---|---|
| 1 | | | | 3 | | | |
| 2 | | | | 4 | | | |

## ISSUE UPDATE

24. General lobbying issue that no longer pertains

## AFFILIATED ORGANIZATIONS

25. Add the following affiliated organization(s)

Internet Address:

| Name | Address<br>Street Address<br>City                State/Province    Zip    Country | Principal Place of Business<br>(city and state or country) |
|---|---|---|
| | | City<br>State            Country<br>City<br>State            Country |

26. Name of each previously reported organization that is no longer affiliated with the registrant or client

| 1 | 2 | 3 |
|---|---|---|

## FOREIGN ENTITIES

27. Add the following foreign entities

| Name | Address<br>Street Address<br>City            State/Province   Country | Principal place of business<br>(city and state or country) | Amount of contribution<br>for lobbying activities | Ownership<br>percentage in<br>client |
|---|---|---|---|---|
| | | City<br>State        Country | | % |

28. Name of each previously reported foreign entity that no longer owns, or controls, or is affiliated with the registrant, client or affiliated organization

| 1 | 3 | 5 |
|---|---|---|
| 2 | 4 | 6 |

Printed Name and Title    James B. Christian, Partner

| Clerk of the House of Representatives | Secretary of the Senate |
|---|---|
| Legislative Resource Center | Office of Public Records |
| B-106 Cannon Building | 232 Hart Building |
| Washington, DC 20515 | Washington, DC 20510 |
| http://lobbyingdisclosure.house.gov | http://www.senate.gov/lobby |

# LOBBYING REPORT

Lobbying Disclosure Act of 1995 (Section 5)   **- All Filers Are Required to Complete This Page**

**1. Registrant Name**  ☑ Organization/Lobbying Firm  ☐ Self Employed Individual

### PATTON BOGGS LLP

**2. Address**  ☐ **Check if different than previously reported**

Address1 **2550 M STREET, NW**   Address2

City **WASHINGTON**   State **DC**   Zip Code **20037** -   Country **USA**

**3. Principal place of business (if different than line 2)**

City   State   Zip Code  -   Country

**4a. Contact Name**   b. Telephone Number   c. E-mail   **5. Senate ID#**
☐ International Number

**James B. Christian**   **(202) 457-6484**   **LDAdmins@pattonboggs.com**   **30906-1002674**

**7. Client Name**  ☐ *Self*   ☐ *Check if client is a state or local government or instrumentality*   **6. House ID#**

**Compania Anonima de Explotaciones Industries**   **319170930**

**TYPE OF REPORT**   8. Year **2008**   Q1 (1/1 - 3/31) ☐   Q2 (4/1 - 6/30) ☑   Q3 (7/1-9/30) ☐   Q4 (10/1 - 12/31) ☐

9. Check if this filing amends a previously filed version of this report  ☐

10. Check if this is a Termination Report  ☐   Termination Date   11. No Lobbying Issue Activity  ☐

**INCOME OR EXPENSES** **- YOU MUST complete either Line 12 or Line 13**

| **12. Lobbying** | **13. Organizations** |
|---|---|
| **INCOME** relating to lobbying activities for this reporting period was: | **EXPENSE** relating to lobbying activities for this reporting period were: |
| Less than $5,000  ☐ | Less than $5,000  ☐ |
| $5,000 or more  ☑  $ **$  90,000.00** | $5,000 or more  ☐  $ |
| Provide a good faith estimate, rounded to the nearest $10,000, of all lobbying related income from the client (including all payments to the registrant by any other entity for lobbying activities on behalf of the client). | **14. REPORTING**   Check box to indicate expense accounting method. See instructions for description of options. |
| | ☐ **Method A.** Reporting amounts using LDA definitions only |
| | ☐ **Method B.** Reporting amounts under section 6033(b)(8) of the Internal Revenue Code |
| | ☐ **Method C.** Reporting amounts under section 162(e) of the Internal Revenue Code |

Signature   **Filed Electronically**   Date   **07/19/2008**

Printed Name and Title   **James B. Christian, Partner**

v6.0.1f   Page 1 of 4

| Registrant | PATTON BOGGS LLP | Client Name | Compania Anonima de Explotaciones Industries |
|---|---|---|---|

**LOBBYING ACTIVITY.** Select as many codes as necessary to reflect the general issue areas in which the registrant engaged in lobbying on behalf of the client during the reporting period. Using a separate page for each code, provide information as requested. Add additional page(s) as needed.

15. General issue area code  `AGR`   `AGRICULTURE`   (one per page)

16. Specific lobbying issues

Labor issues in the Dominican Republic.

17. House(s) of Congress and Federal agencies   ☐ Check if None

U.S. SENATE, U.S. HOUSE OF REPRESENTATIVES, Labor - Dept of (DOL), State - Dept of (DOS)

18. Name of each individual who acted as a lobbyist in this issue area

| First Name | Last Name | Suffix | Covered Official Position (if applicable) | New |
|---|---|---|---|---|
| Joseph | Brand | | | ☐ |
| Read | McCaffrey | | | ☐ |
| Scott | Thompson | | | ☐ |
| Aubrey | Rothrock | | | ☐ |
| Stephanie | Peters | | | ☐ |
| | | | | ☐ |
| | | | | ☐ |
| | | | | ☐ |
| | | | | ☐ |

19. Interest of each foreign entity in the specific issues listed on line 16 above   ☑ Check if None

Printed Name and Title   James B. Christian, Partner

v6.0.1f

Registrant   **PATTON BOGGS LLP**        Client Name   Compania Anonima de Explotaciones Industries

**LOBBYING ACTIVITY.** Select as many codes as necessary to reflect the general issue areas in which the registrant engaged in lobbying on behalf of the client during the reporting period. Using a separate page for each code, provide information as requested. Add additional page(s) as needed.

15. General issue area code | FOR | FOREIGN RELATIONS | (one per page)

16. Specific lobbying issues

> Labor issues in the Dominican Republic.

17. House(s) of Congress and Federal agencies ☐ Check if None

> U.S. SENATE, U.S. HOUSE OF REPRESENTATIVES, Labor - Dept of (DOL), State - Dept of (DOS)

18. Name of each individual who acted as a lobbyist in this issue area

| First Name | Last Name | Suffix | Covered Official Position (if applicable) | New |
|---|---|---|---|---|
| Joseph | Brand | | | ☐ |
| Read | McCaffrey | | | ☐ |
| Stephen | Gavin | | | ☐ |
| Scott | Thompson | | | ☐ |
| Aubrey | Rothrock | | | ☐ |
| Stephanie | Peters | | | ☐ |
| | | | | ☐ |
| | | | | ☐ |
| | | | | ☐ |

19. Interest of each foreign entity in the specific issues listed on line 16 above ☑ Check if None

**Printed Name and Title**   James B. Christian, Partner

v6.0.1f

| Registrant | PATTON BOGGS LLP | Client Name | Compania Anonima de Explotaciones Industries |
|---|---|---|---|

**Information Update Page - Complete ONLY where registration information has changed.**

20. Client new address

Address _____

City _____ State _____ Zip Code _____ - _____ Country _____

21. Client new principal place of business (if different than line 20)

City _____ State _____ Zip Code _____ - _____ Country _____

22. New General description of client's business or activities

## LOBBYIST UPDATE

23. Name of each previously reported individual who is no longer expected to act as a lobbyist for the client

| | First Name | Last Name | Suffix | | First Name | Last Name | Suffix |
|---|---|---|---|---|---|---|---|
| 1 | | | | 3 | | | |
| 2 | | | | 4 | | | |

## ISSUE UPDATE

24. General lobbying issue that no longer pertains

## AFFILIATED ORGANIZATIONS

25. Add the following affiliated organization(s)

Internet Address:

| Name | Address | Principal Place of Business (city and state or country) |
|---|---|---|
| | Street Address | City |
| | City       State/Province   Zip   Country | State          Country |
| | | City |
| | | State          Country |

26. Name of each previously reported organization that is no longer affiliated with the registrant or client

| 1 | 2 | 3 |
|---|---|---|

## FOREIGN ENTITIES

27. Add the following foreign entities

| Name | Address | Principal place of business (city and state or country) | Amount of contribution for lobbying activities | Ownership percentage in client |
|---|---|---|---|---|
| | Street Address | | | |
| | City       State/Province   Country | City | | |
| | | State     Country | | % |

28. Name of each previously reported foreign entity that no longer owns, or controls, or is affiliated with the registrant, client or affiliated organization

| 1 | 3 | 5 |
|---|---|---|
| 2 | 4 | 6 |

**Printed Name and Title**    James B. Christian, Partner

v6.0.1f

Page 4 of 4

# Exhibit 3

# AFFIDAVIT OF PROCESS SERVER

## United States District Court

## District Of Columbia

**Felipe Vicini Lluberes, et al**

    Plaintiff

vs.

**Uncommon Productions, et al**

    Defendant

Attorney:

Levine Sullivan Koch & Schulz, L.L.P.
Elizabeth Koch
1050 17th St., NW, S-800
Washington, DC. 20036

**Case Number:** 07-116223 (DPW) (D. Mass.)

Legal documents received by Same Day Process Service on July 25th, 2008 at 5:00 PM to be served upon **Joseph L. Brand, Esq. at Patton Boggs, LLP, 2500 M St., NW, Washington, DC. 20037**

I, Brandon A. Snesko, swear and affirm that on **July 28th, 2008 at 4:08 PM**, I did the following:

**Individually** Served **Joseph L. Brand, Esq.** the person listed as the intended recipient of the legal document with this **Subpoena in a Civil Case; Exhibit A at Patton Boggs, LLP, 2500 M St., NW, Washington, DC 20037.**

**Description of Person Accepting Service:**
Sex: Male   Age: 70   Height: 6'2   Weight: 190   Skin Color: White   Hair Color: White   Glasses: N

**Supplemental Data Appropriate to this Service:**

I declare under penalty of perjury under the laws of the that the foregoing information contained in this affidavit is true and correct and that I am a professional process server over the age of 18 and have no interest in the above legal matter.

_____
**Brandon A. Snesko**
Process Server

**Same Day Process Service**
1322 Maryland Ave., NE
Washington, DC 20002

**(202) 398-4200**

Internal Job ID: 0000011411

District of Columbia: SS
Subscribed and Sworn to before me,
this 29th day of July 2008

_____
Michael Motash, Notary Public, D.C.
My commission expires July 14, 2012

Copyright © 2005-2007 Process Server Central, LLC. All rights reserved.

# Exhibit 4

AO88 (Rev. 12/06) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT
### DISTRICT OF COLUMBIA

Felipe Vicini Lluberes, et al.

V.

Uncommon Productions, et al.

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]   07-116223 (DPW) (D. Mass.)

TO:  Joseph L. Brand
Patton Boggs, LLP
2500 M Street, N.W.
Washington, DC 20037

☐  YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☑  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION   Levine Sullivan Koch & Schulz, L.L.P.<br>1050 17th St., N.W., S-800, Washington, DC 20036 | DATE AND TIME<br>8/5/2008 10:00 am |
|---|---|

☑  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See accompanying Exhibit A

| PLACE   Levine Sullivan Koch & Schulz, L.L.P.<br>1050 17th St., N.W., S-800, Washington, DC 20036 | DATE AND TIME<br>8/4/2008 10:00 am |
|---|---|

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)<br>, counsel for Defendants | DATE<br>July 25, 2008 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Elizabeth C. Koch
Levine Sullivan Koch & Schulz, L.L.P., 1050 17th St., N.W., S-800, Washington, DC 20036  (202) 508-1100

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88 (Rev. 12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.
(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.
(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.
(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.
(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it
(i) fails to allow reasonable time for compliance;
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;
(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) If a subpoena
(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject

to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.
(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.
(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.
(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.
(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.
(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.
(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

## Exhibit A

Pursuant to the attached Subpoena, you are commanded to produce the following documents in your possession, custody or control:

### Definitions:

"Document" means any and every kind of printed, typed, recorded, written, graphic or photographic matter (including any form of recordings), however printed, produced, reproduced, coded, or stored (including in electronic or digitized form), of any kind or description, whether sent or received or not, including originals, copies, reproductions, facsimiles, and drafts, regardless of their author or origin, however denominated, as well as any other materials not described above but which are encompassed by the Federal Rules of Civil Procedure.

"All documents that in any manner relate to" means any and all documents concerning, referring to, alluding to, responding to, in connection with, commenting on, about, regarding, announcing, explaining, discussing, showing, describing, studying, reflecting, analyzing or constituting the subject matter of the particular category of requested documents.

"Lobbying Services" means communications with any employee, official, or agent of the United States government – including the Executive and Legislative branches and any independent agencies or contractors, but excluding the Judiciary.

"The Vicinis" means Felipe Vicini Lluberes, Juan Vicini Lluberes, Compania Azucarera de Empresas Industriales, Compania Anonima de Exploitaciones Industries, Ingenio Cristobal Colon, Grupo Vicini and/or any other company substantially owned or controlled by the Vicini family, related to the sugar business.

### Documents Requested:

All non-privileged documents that in any manner relate to Lobbying Services provided by you or Patton Boggs, LLP for on on behalf of The Vicinis for the period 2003 to the present.

{00138386;v1}

# Exhibit 5

# LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.

WASHINGTON, D.C.     NEW YORK     PHILADELPHIA     DENVER

1050 SEVENTEENTH STREET, N.W.
SUITE 800
WASHINGTON, D.C. 20036
(202) 508-1100 PHONE
(202) 861-9888 FAX
www.lskslaw.com

WRITER'S DIRECT DIAL
202-508-1128
e@lskslaw.com

July 25, 2008

Joseph L. Brand, Esq.
Patton Boggs, LLP
2500 M Street, N.W.
Washington, DC  20036

Re:  *Felipe Vicini Lluberes, et al. v. Uncommon Productions, LLC,*
     *et al.*, Case No.  07 CA 11623 (DPW) (D. Mass.)

Dear Mr. Brand:

As you may know, this firm represents the defendants in the above-referenced action.

We recently received from the U.S. State Department documents reflecting lobbying efforts made by you on behalf of the Vicinis and their companies.  In order to obtain relevant information regarding these efforts, we have enclosed a Subpoena seeking related documents and deposition testimony.  As you will note, we have scheduled the deposition for Tuesday, August 5, 2008.  While we have some flexibility regarding that date, please note that there is an August 11 discovery cut-off in the litigation and we will need to conduct your deposition prior to that time.

Very truly yours,

LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.

By _____
Elizabeth C. Koch

ECK:pks

{00138474;v1}

# Exhibit 6



2550 M Street, NW
Washington, DC 20037-1350
202-457-6000

Facsimile 202-457-6315
www.pattonboggs.com

August 1, 2008

Benjamin G. Chew
202-457-6015
bchew@pattonboggs.com

<u>**VIA E-MAIL AND HAND DELIVERY**</u>

Elizabeth C. Koch, Esq.
LEVINE SULLIVAN KOCH & SCHULZ, LLP
1050 17th Street, N.W., Suite 800
Washington, D.C. 20036

Re:     **Response and Objections to Subpoena of Trial Counsel in *Felipe Vicini Lluberes, et al. v. Uncommon Productions, et al.*, Case. No. 07-11632 (DPW)**

Dear Betsy:

On Monday, July 28, 2008, you served a subpoena (the "Subpoena") on my partner, Mr. Joseph Brand, Esq., seeking deposition testimony and documents relating to his and Patton Boggs LLP's (the "Firm") purported lobbying services provided to Plaintiffs Juan and Felipe Vicini Lluberes (the "Vicinis"). This letter shall serve as Mr. Brand's and the Firm's formal response and objections to the Subpoena.

As you know, the Firm has served as trial counsel to the Vicinis in their defamation action against your clients, Defendants William Haney and Uncommon Productions, since the Complaint was filed on August 31, 2007, Civil Action No. 07-11632 (DPW) (D. Mass.) (the "Underlying Action").

As a threshold matter, it is troubling that you waited until the eve of the close of discovery— eight months after Judge Woodlock entered the Scheduling Order in the Underlying Action— to suddenly seek discovery from trial counsel. As you are no doubt aware, serving a subpoena upon trial counsel is a serious matter that materially interferes with the party's ability to prepare for trial, and therefore is universally disfavored by the courts. The concern is particularly acute where, as here, the parties are approaching the end of discovery, the deadline for further dispositive motions and trial preparation. Following up on the July 28th email of my partner, Read McCaffrey, we fully intend to examine this issue closely and, if appropriate, raise it with Judge Woodlock or with the local district court.

Also troubling is your representation that you served a copy of the Subpoena on me on Friday afternoon, July 25. That is false. I was in the office from early until late afternoon Friday and again on Saturday and Sunday. The first notice I received of your Subpoena was

**PATTON BOGGS** LLP
ATTORNEYS AT LAW

Elizabeth C. Koch, Esq.
August 1, 2008
Page 2

an e-mail from Mr. Brand at 4:31 p.m. apprising me that he had been served and attaching a copy of the Subpoena. It was only later that day (4:56 p.m.) that I received a call from our Delivery Booth apprising that a package (containing the Subpoena) had arrived for me. Also, without explanation, you waited to serve Defendants' formal Notice of Mr. Brand's deposition until the late afternoon of Wednesday, June 30. Thus, Defendants failed to provide the Vicinis with the required notice of the Subpoena in violation of Rule 45(b)(1).[1]

Moreover, the Subpoena is deficient in several other material ways, and Mr. Brand and the Firm hereby object as follows:

1)    The Definition of "Lobbying Services" to include all non-judicial federal government communications is so vague and overly broad as to encompass information that is neither relevant to the underlying action nor likely to lead to the discovery of admissible evidence. Additionally, Mr. Brand and the Firm object to this Definition to the extent that it encompasses information protected from disclosure by the attorney work product doctrine and/or the attorney-client privilege.

2)    The Definition of "The Vicinis" also is so vague and overly broad as to encompass information concerning non-party business entities that is neither relevant to the underlying action nor likely to lead to the discovery of admissible evidence. Additionally, Mr. Brand and the Firm object to this Definition to the extent that it encompasses information protected from disclosure by the attorney work product doctrine and/or the attorney-client privilege, which would preclude Mr. Brand's testimony on virtually all matters concerning the Vicinis.

3)    Any information sought from Mr. Brand or the Firm concerning the Firm's "lobbying" services also can be obtained from more readily accessible sources other than trial counsel such as public lobbying records or federal government personnel without jeopardizing the attorney-client relationship in the underlying action and the disclosure of information subject to the attorney-client privilege or attorney work product doctrine.

4)    The burden of obtaining information from trial counsel and jeopardizing the attorney-client relationship, particularly at this late stage of the proceedings, also far outweighs any possible benefit of any marginally relevant non-privileged information that Defendants might obtain through the Subpoena.

---

[1] All of this begs the question of why you would not also have sent me a copy via e-mail, our usual means of communicating, especially in light of the fact that you sent me e-mails earlier Monday (at 9:58 a.m. and 3:27 p.m.). Of course, no one has yet to explain how members of the Bar can stand mute (or worse) while the primary witness in the case (Father Christopher Hartley) commits perjury to avoid having to answer for his prior falsehoods.

**PATTON BOGGS** LLP
ATTORNEYS AT LAW

Elizabeth C. Koch, Esq.
August 1, 2008
Page 3

     5)    The Subpoena also is overly broad temporally in that it seeks documents from 2003 to the present, which covers lengthy periods of time not at issue in the Underlying Action.

     6)    The Subpoena is unreasonably cumulative in light of the discovery already obtained or requested from the Vicinis, and the deposition requested is unreasonably cumulative and duplicative of the document requests propounded in the Subpoena, itself.

     7)    The risk of disclosure of privileged attorney-client communications and attorney work product (including information bearing upon litigation strategy) posed by deposing trial counsel far outweighs any potential benefit of any marginally relevant, non-privileged information that trial counsel might have.

     8)    Mr. Brand and the Firm further object to the extent that the Subpoena imposes upon them any obligations beyond those set forth in the Federal Rules of Civil Procedure and the Local Rules of the United States District Court of the District of Columbia.

               *       *       *

     Subject to, and without waiving, the above general and specific objections or any applicable privileges, Mr. Brand and the Firm respond that there are no non-privileged documents relating to lobbying services provided to the Vicinis because neither Mr. Brand nor the Firm have provided lobbying services to Juan and Felipe Vicini Lluberes.

     For the reasons set forth above, Mr. Brand will not be made available for deposition on August 5, 2008, or on any other date absent a court order.

     Moreover, should you decide to file a motion to compel or take any other action requiring the formulation of a response, we will move for sanctions against you and your clients for abusing the discovery process as a tactic to manufacture grounds to disqualify counsel and will ask for an award of our reasonable fees and costs associated with preparing our responses.

     We therefore request that Defendants immediately withdraw the Subpoena and cease further interference with the Vicinis' trial preparations and the attorney-client relationship.

               Very truly yours,

               Benjamin G. Chew

4972386

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE SUBPOENA *DUCES TECUM* TO **JOSEPH L. BRAND** | **MISC. CASE NO. _____** |
| **FELIPE VICINI LLUBERES and JUAN VICINI LLUBERES,**<br><br>                    **Plaintiffs,**<br><br>      **vs.**<br><br>**UNCOMMON PRODUCTIONS, LLC and WILLIAM M. HANEY III,**<br><br>                    **Defendants.** | **CIVIL ACTION NO. 07-11623 (D. Mass.)** |

## DECLARATION OF ELIZABETH C. KOCH

Elizabeth C. Koch, pursuant to 28 U.S.C. § 1746, declares as follows:

1.       I am member of the law firm Levine Sullivan Koch & Schulz, L.L.P., counsel for Uncommon Productions, LLC and William M. Haney, III ("Movants").  I submit this declaration in support of the Motion to Compel Compliance with Subpoena Duces Tecum and Request for Order to Show Cause Why Non-Party Joseph L. Brand Should Not Be Held in Contempt.

2.       On or about July 24, 2008, Movants received a production of documents from the U.S. Department of State in connection with the civil litigation captioned as *Lluberes, et al. v. Uncommon Prods., LLC, et al.*, No. 1:07-cv-11623 (D. Mass.) ("the Litigation").  Included among those documents was an electronic mail message and attachments sent by Joseph L. Brand to four State Department officials reflecting lobbying activities by plaintiffs in the Litigation and their companies ("the Vicinis").  After obtaining the documents, I made several attempts to contact Mr. Brand by telephone to discuss obtaining relevant evidence from him and

to arrange for service of a subpoena, but I did not receive a response to any of the messages that I left for him on July 25 and 28.

      3.      On July 25, 2008, I issued a issued a subpoena *duces tecum* from this Court seeking documents and testimony from Mr. Brand relating to his lobbying activities on behalf of the Vicinis.  That afternoon, I directed that a copy of the subpoena be hand-delivered by courier to the office of plaintiffs' counsel, Benjamin G. Chew.  According to the delivery log of the courier service, Apple Courier Inc., the envelope containing the subpoena was delivered to the law offices of Patton Boggs, LLP, Mr. Chew's firm, at 2550 M Street, N.W., in Washington, D.C., at 6:31 p.m. on July 25, and accepted by a Mr. Steffon Brandon.

      4.      Attached hereto as Exhibit 1 is a true and correct copy of the email and attachments that are referenced in Paragraph 2, above, and which are bates-numbered STATE-D001 through STATE-D012.

      5.      Attached hereto as Exhibit 2 is a true and correct copy of lobbying disclosure reports obtained from the website of the U.S. Senate Office of Public Records, which reflect disclosures made by Patton Boggs LLP regarding lobbying activities conducted for the Vicinis.

      6.      Attached hereto as Exhibit 3 is a true and correct copy of an affidavit by Brandon A. Snesko, a process server, attesting to the service of the subpoena *duces tecum* upon Mr. Brand on July 28, 2008, at 2550 M Street, N.W., in Washington, D.C.

      7.      Attached hereto as Exhibit 4 is a true and correct copy of the subpoena *duces tecum* served upon Mr. Brand.

      8.      Attached hereto as Exhibit 5 is a true and correct copy of the cover letter from me to Mr. Brand that accompanied the subpoena *duces tecum*.

9.      Attached hereto as Exhibit 6 is a true and correct copy of a letter I received from Mr. Chew on August 1, 2008, regarding the subpoena to Mr. Brand.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 10, 2008.

Elizabeth C. Koch