## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNCOMMON PRODUCTIONS, LLC and WILLIAM M. HANEY III,** | |
| **Movants,** | |
| **v.** | **Misc. Case No. 08-00517 (RJL)** |
| **JOSEPH L. BRAND, ESQ.,** | **ORAL HEARING REQUESTED** |
| **Respondent.** | |

## CROSS-MOTION TO QUASH SUBPOENA

Joseph L. Brand, Esq. ("Mr. Brand"), counsel to Plaintiffs Felipe Vicini Lluberes and Juan Vicini Lluberes ("Plaintiffs" or the "Vicinis") in the underlying action, *Lluberes, et al. v. Uncommon Prods., LLC, et al.*, No. 1:07-cv-11623 (D. Mass.) ("Underlying Action"), by and through his undersigned counsel, pursuant to Rules 45, 26 and 11 of the Federal Rules of Civil Procedure and the Local Rules, hereby moves this Honorable Court for an Order quashing the subpoena *duces tecum* served upon him by Movants Uncommon Productions, LLC and William Haney III ("Movants" or "Defendants"), defendants in the Underlying Action, and further requests that the Court order Defendants to reimburse him for his reasonable attorneys fees and costs associated with responding to Defendants' frivolous request for an order to show cause.

A memorandum of points and authorities in support accompanies this Cross Motion, as well as a proposed Order for the Court's consideration.

Respectfully submitted,

4976234

/s/ Benjamin G. Chew
Read K. McCaffrey
Stephen Díaz Gavin
Benjamin G. Chew (D.C. Bar # 418577)
PATTON BOGGS LLP
2550 M St, N.W.
Washington, DC 20037
Telephone:  (202) 457-6015
Facsimile:  (202) 457-6315
e-mail:  bchew@pattonboggs.com


Counsel for Joseph L. Brand, Esq.


Dated:  August 22, 2008

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of August, 2008, the foregoing cross-motion was filed

with the Court via its CM/ECF system, and will be sent electronically to the registered participants

as identified on the Notice of Electronic Filing (NEF), and served via first class mail, postage

prepaid, upon:

Elizabeth C. Koch (admitted *pro hac vice*)
LEVINE SULLIVAN KOCH & SCHULZ, LLP
1050 Seventeenth Street, N.W.
Washington, D.C.  20036
Telephone:  (202) 508-1100
Facsimile:  (202) 861-9888
E-mail:  bkoch@lskslaw.com

Counsel for Defendants
Uncommon Productions, LLC
and William M. Haney, III


/s/Benjamin G. Chew
Benjamin G. Chew

4976234

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNCOMMON PRODUCTIONS, LLC and WILLIAM M. HANEY III,** | |
| **Movants,** | |
| **v.** | **Misc. Case No. 08-00517 (RJL)** |
| **JOSEPH L. BRAND, ESQ.,** | **ORAL HEARING REQUESTED** |
| **Respondent.** | |

**JOSEPH L. BRAND'S OPPOSITION TO MOTION TO COMPEL**
**COMPLIANCE WITH SUBPOENA *DUCES TECUM* AND MEMORANDUM IN**
**SUPPORT OF CROSS-MOTION TO QUASH SUBPOENA**

Joseph L. Brand, Esq. ("Mr. Brand"), counsel to Plaintiffs Felipe Vicini Lluberes and Juan

Vicini Lluberes ("Plaintiffs" or the "Vicinis") in the underlying action, *Lluberes, et al. v. Uncommon*

*Prods., LLC, et al.*, No. 1:07-cv-11623 (D. Mass.) ("Underlying Action"), by and through his

undersigned counsel, hereby opposes the Motion to Compel Compliance with Subpoena *Duces*

*Tecum* and Request for Order to Show Cause ("Motion to Compel") of Movants Uncommon

Productions, LLC and William Haney III ("Movants" or "Defendants"), defendants in the

Underlying Action, and further moves this Honorable Court for an Order quashing the subpoena

and denying Movants' Motion to Compel, stating as follows:

## I.    INTRODUCTION

Through their Motion to Compel, filed on the last day of the extended discovery period in

the Underlying Action (August 11, 2008), Defendants seek documents and deposition testimony

from opposing counsel.  The fact that Defendants waited until the close of discovery to identify

opposing counsel as a source of potential discovery—particularly as Defendants have known for months, and possibly a year, that Plaintiffs' law firm also provided lobbying services to a company affiliated with Plaintiffs—strongly suggests that Defendants' real goal is to harass Plaintiffs at a very late stage in the proceedings by wrongfully interfering with their trial preparations and attempting to manufacture grounds on which to seek the disqualification of Plaintiffs' counsel. Defendants' real motive in seeking discovery from opposing counsel was exposed when they recently rejected Plaintiffs' offer to make Mr. Brand available for a one-half day deposition on a conditional basis (providing Defendants would not seek to disqualify Plaintiffs' counsel from serving as trial counsel in the Underlying Action). The Court should not countenance Defendants' disingenuous and overreaching request, and therefore should deny their Motion to Compel and grant Plaintiffs' Cross Motion to Quash the subpoena.

Defendants' bad faith in seeking Mr. Brand's subpoena is further amplified by the fact that they have falsely accused Mr. Brand, a longstanding member of the Bar, of contemptuous conduct and wrongfully sought to hold him in contempt for not attending a deposition (noticed to be taken just six business days after he was served) when Defendants knew or should have known that their subpoena was defective and invalid.

Pursuant to Rule 45(b)(1), the subpoena was defective in two material respects: (1) Defendants failed to tender the witness and mileage fees mandated by federal statute; and (2) Defendants failed to provide notice of the subpoena to Plaintiffs' counsel in advance of serving Mr. Brand. Defendants concede this first point as they belatedly attempted to cure this defect by delivering a check for $40.00 to Mr. Brand on August 18, 2008—twenty-one days *after* service of the subpoena on Mr. Brand, thirteen days *after* the unilaterally-decided deposition date, and a full week *after* Defendants filed their Motion to Compel seeking a contempt order and sanctions against Mr. Brand for not appearing on August 5, 2008. **Exhibit A**, Declaration of Benjamin G. Chew ("Chew

Decl."), ¶¶ 9, 17, 18.  This material defect excused Mr. Brand from attending the deposition noticed

for August 5, 2008, thereby precluding the imposition of sanctions as a matter of law.[1]

Second, while Defendant's counsel may have "directed that a copy of the subpoena be hand-

delivered by courier to the office of [P]laintiffs' counsel," on July 25, 2008, (Koch Decl. ¶3),[2] the

copy of the subpoena was *not* delivered to Plaintiffs' counsel until *after* Defendants served Mr. Brand.

**Exhibit A**, Chew Decl. ¶¶ 7, 9, 10.  What was delivered to Plaintiffs' counsel by courier on July 25

at 6:33 p.m. was a copy of the documents Defendants received from the U.S. State Department.  *Id.*

at ¶ 7.  The package directed to Plaintiffs' counsel containing a copy of the subpoena was delivered

by the same courier at 4:54 p.m. Monday July 28, 2008, almost an hour after Defendants served Mr.

Brand.  *Id.* at ¶¶ 8, 10.  Even assuming *arguendo* that the subpoena were not defective and invalid,

Defendants' Motion to Compel would be moot because Mr. Brand already had responded in writing

to the subpoena and advised Defendants that he had no documents or other information to produce

concerning lobbying services rendered on behalf of the individual Plaintiffs because Plaintiffs did

not retain Patton Boggs to provide them any lobbying services.  Rather, a company organized under

the laws of the Dominican Republic affiliated with the Plaintiffs, Compania Anonima de

Explotaciones Industries ("CAEI"), separately retained Patton Boggs in the Spring of 2007 (after

Defendants' purported documentary publicly premiered) to provide lobbying services as reflected on

the public disclosures attached to Defendants' Motion to Compel.[3]  Regardless, analyzing the

---

[1]  On Thursday, August 21, 2008, Mr. Chew notified counsel for Defendants that Mr. Brand rejected Defendants' untimely payment of the witness fee, but that he would hold the check pending the Court's ruling on Defendants' Motion to Compel.  **Exhibit A,** Chew Decl. ¶ 18.

[2]  Ms. Koch's declaration is attached to Defendants' Motion to Compel.  At paragraph 3, she further declares that according "to the delivery log of the courier service, Apple Courier, Inc., the envelope containing the subpoena was delivered to the law offices of Patton Boggs, LLP, … at 6:31 p.m. on July 25, and accepted by a Mr. Steffon Brandon." On August 22, 2008, Defendants' counsel forwarded the specific delivery log from Apple Courier.  **Exhibit A**, Chew Decl. ¶ 19.  Importantly, that record makes no reference as to exactly *what* document was delivered on July 25. Accordingly, Ms. Koch's conclusory statement concerning the courier's record is wrong.

[3]  Defendants attached a copy of the publicly-available disclosure statements at Exhibit 2 to Ms. Koch's declaration.

subpoena pursuant to the strict factors set forth in *Shelton v. American Motors Corp.*, 805 F.2d 1323 (8th Cir. 1986) and its progeny (as adopted by the U.S. District Court for the District of Columbia), which universally disfavor taking the testimony of opposing counsel, warrants that Defendants' Motion to Compel be denied and their subpoena be quashed.

## II.     RELEVANT FACTS

### A.     Defendants Have Long Known of Patton Boggs' Lobbying Activity Related to *The Price of Sugar ("POS")*

Defendants' prior knowledge of lobbying activity by Patton Boggs, dating from at least the Spring of 2007, establishes that the subpoena was meant for harassment rather than genuine discovery. While Defendants' counsel claims to have first learned of Patton Boggs' Lobbying activity on behalf of CAEI as a result of documents produced by the Department of State, on or about July 24, 2008, documents produced in the Underlying Action show that Defendants knew or at least should have known of Patton Boggs' lobbying efforts as early as June 2007. Indeed, the United States Department of State produced in response to the Vicinis' subpoena the "White Paper" that forms the basis of Defendants' motion. The Vicinis provided Defendants a copy of the State Department documents on July 17, 2008. **Exhibit B**.[4] The White Paper clearly identifies Mr. Brand as one of the Patton Boggs attorneys representing CAEI. **Exhibit C**, at STATE000773, 784.

This was not the first time Defendants had seen this document, however. On June 29, 2007, (the date of the e-mail attached as Defendants' Exhibit 1) a State Department employee (David Searby) forwarded the White Paper and another document to Father Christopher Hartley,[5] noting that the Patton Boggs told Mr. Searby that he (Searby) could share the document with Fr. Hartley.

---

[4] The White Paper produced by the State Department to Plaintiffs is bates numbered STATE000772-784.

[5] Fr. Hartley partnered with Defendants in planning, staging, and shooting *POS*, and also was involved to some extent in post-production commentary and review. Even after the film's completion, Fr. Hartley kept up regular correspondence with Defendants.

**Exhibit C** (June 29, 2007, e-mail exchange between Fr. Hartley and David Searby, at STATE000772). Later that same day, Fr. Hartley forwarded Mr. Searby's e-mail with the attached documents to his (Fr. Hartley's) distribution list, claiming that "[t]his is part of the ongoing dialogue between the State Department and the Patton Boggs law firm defending the Vicini family." *Id.* Documents and deposition testimony produced in the Underlying Action show ██████████ ████████████████████████████████. **Exhibit D**, (███████████████████ ██████████████████████████████████);[6] **Exhibit G** (Excerpt from the June 23, 2008, deposition of Eric Grunebaum, ██████████████████████████████ ██); **Exhibit H** (████████████████████████████████████████ ██████████████████████████████).[7]

        Moreover, on October 17, 2007, ████████████████████████████ ████████████████████████████████████████████████████. **Exhibit I**, attached hereto. In light of this, and noting that Fr. Hartley had been circulating evidence of lobbying efforts prior to the Vicinis filing the Complaint in the Underlying Action, it is virtually certain that Defendants and their counsel knew it as well, ██████████ ████████████████████████████████████████████████████ ██████████████████████████.

---

[6] Defendants were also aware of the November 2007 screening of *POS* by the Congressional Human Rights Caucus, and of the Congressional delegation that visited the Dominican Republic in late 2006 to examine issues germane to topics covered in *POS*. **Exhibits E & F**, attached hereto. Given this extensive knowledge of the interest of U.S. government entities in issues covered by *POS*, claims that Defendants had no inkling that CAEI or the Plaintiffs might be involved in lobbying or government relations activities until July 2008 is absurd. Furthermore, this specific information squarely belies Defendants' claim that self-help would have been an exercise in futility in this case: "Without any details about the specific officials with whom the Vicinis' lobbyists have been in contact, it would take perhaps hundreds of subpoenas to congressional offices and federal agencies to obtain the information that Brand possesses and that the Subpoena seeks." Def. Mot. at 11 n.9.

[7] Defendants in the Underlying Action have not yet produced their copy of the June 29, 2007, e-mail from Fr. Hartley. To date, Defendants have refused to produce *any* communications with Fr. Hartley after April 2007, asserting that somehow such communications are privileged. This assertion is the subject of a Motion to Compel, currently pending in the Underlying Action. Nevertheless, the e-mails forming the composite **Exhibit H** show ██████████████████ ██████████████████████████████.

Thus, it appears that Defendants served this subpoena merely to harass Plaintiffs and their counsel. Rather than placing Plaintiffs and the Court on notice *when Defendants first learned of Patton Boggs' lobbying activities* that they intended to seek discovery from opposing counsel, Defendants waited until the final days of the extended discovery period to serve the subpoena upon Mr. Brand, and then waited until the last day of the extended discovery period, August 11, 2008, to file their Motion to Compel (in which Defendants falsely accuse Mr. Brand of contemptuously failing to attend a deposition when he had no legal obligation to do so). The subpoena further imposed unreasonable deadlines including the production of documents within just five business days (August 4, 2008) of service, and a deposition the following day (August 5, 2008). Defendants undoubtedly timed their service of the subpoena to ensure that Plaintiffs' Objections pursuant to Rule 45(c)(2)(B) would be received in time for Defendants to file their Motion to Compel on the last day of the extended discovery period.

**B.  Defendants Flatly Rejected Plaintiffs' Reasonable Proposal**
**to Produce Mr. Brand for Deposition**

During a telephone conference between Plaintiffs' and Defendants' counsel on Friday, August 15, 2008, Plaintiffs offered to produce Mr. Brand for deposition, subject to certain reasonable conditions, including that the deposition be limited to one-half day and that Defendants forgo any motion to disqualify. **Exhibit A**, Chew Decl. at ¶ 15. At Defendants' request, Plaintiffs forwarded a proposed Consent Order to Defendants' counsel on Sunday, August 17, 2008. *Id.* at ¶ 16. Defendants responded with patently unreasonable and unfair demands, insisting that Plaintiffs pay all of Defendants' costs regarding the instant motion, even after acknowledging that the subpoena was defective (rendering their demand for a contempt order frivolous). *Id.* Defendants also refused to agree to limit the deposition to one-half day or to refrain from moving to disqualify Plaintiffs' counsel based upon Mr. Brand's deposition, indicating that their true intent in seeking to depose Plaintiffs' counsel was for reasons other than obtaining discovery. *Id.* Defendants' failure to

negotiate a good faith resolution to their Motion to Compel even after Plaintiffs conditionally offered to make Mr. Brand available for deposition therefore necessitated the filing of Mr. Brand's Opposition and Cross Motion to Quash.

### III.    <u>ARGUMENT</u>

**A.    The Subpoena Was Defective, Excusing Mr. Brand from Appearing for Deposition and Precluding the Imposition of Sanctions**

Defendants' failure to serve the statutorily-mandated witness and mileage fees upon Mr. Brand along with the subpoena, and their failure to serve Plaintiffs' counsel before serving Mr. Brand, rendered the subpoena defective and invalid as a matter of law, thereby excusing Mr. Brand from attending the deposition noticed for August 5, 2008. Defendants' assertion that Mr. Brand's "willful defiance" of the subpoena should be sanctioned therefore is unwarranted and ill-advised, as Defendants are precluded as a matter of law from obtaining sanctions on the basis of their defective subpoena.

**1.    Defendants' Failure to Serve the Requisite Witness and Mileage Fees Rendered the Subpoena Invalid, Excused Mr. Brand from Appearing for Deposition, and Precluded the Imposition of Sanctions**

As the Court is aware, Federal Rule of Civil Procedure 45(b)(1) mandates that a deponent be provided with both witness and travel fees at the time of service. *Id.* ("*Serving a subpoena requires* delivering a copy to the named person, *and …tendering the fees* for 1 day's attendance and the mileage allowed by law.")(emphasis added). The statutory fee is obligatory and states that "[a] witness shall be paid an attendance fee of $40 per day for each day's attendance." 28 U.S.C. § 1821(b). Moreover, a witness who travels "by common carrier shall be paid for the actual expenses of travel … by the shortest practical route" at the most economical rate reasonably available. 28 U.S.C. § 1821(c)(1).

Here, it is undisputed that Defendants failed to include either of these fees when they served the subpoena. **Exhibit A**, Chew Decl. ¶ 9. Instead, they waited until August 18, 2008 to finally

7

proffer a check, which Mr. Brand did not accept, but which undersigned counsel has retained at his offices pending the Court's resolution of Defendants' Motion to Compel. **Exhibit N.** Pursuant to Rule 45 (b)(1), the subpoena therefore was defective and invalid. *See Judicial Watch, Inc. v. U.S. Dept. of Commerce*, 212 F.R.D. 429, 431 (D.D.C. 2003) ("after the 1991 amendments, the discretion of the courts has been abandoned for a more precise and predictable outcome—either the party taking the deposition pays fees or the subpoena is procedurally invalid.").[8] Even the treatise Defendants cite as "the leading treatise on federal civil procedure" (Def. Mot. at 8) expressly states that witness and mileage fees must be served "at the time the subpoena is served" or the subpoena is "invalid[]." 9A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2454 (2008).[9]

Pursuant to Rule 45(e), Defendants' failure to serve the witness and mileage fees also provided Mr. Brand with an "adequate excuse" not to attend the deposition noticed for August 5, 2008, precluding the imposition of sanctions because the subpoena was defective. *Martin v. Howard University*, 209 F.R.D. 20, 21 (D.D.C. 2002) ("it is clear beyond all question that the failure to tender the witness fee is legitimate grounds for the witness to refuse to appear."). *See also* 9 MOORE'S FEDERAL PRACTICE § 45.62[2][a] (3d ed. 2008), *citing Klockner Namasco Holdings Corp. v. Daily Access.Com, Inc.*, 211 F.R.D. 685, 687 (N.D. Ga. 2002) (party that serves deposition subpoena without tendering required witness fees assumes risk that witness will not appear, and is not entitled to sanctions when that occurs).

Consequently, Defendants' entire motion seeking an order to show cause why Mr. Brand should not be held in contempt for not appearing for deposition is *baseless*. Defendants' Motion

---

[8] *See also In re Dennis*, 330 F.3d 696, 704-05 (5th Cir. 2003)("The conjunctive form of the rule indicates that proper service requires not only personal delivery of the subpoena, but also tendering of the witness fee and a reasonable mileage allowance.").

[9] The requirement for the payment of fees at the time of service is so exacting that a subpoena will be invalid if even one, but not both, fees are paid. *Dennis*, 330 F.3d at 705 (witness fee paid, mileage fee not paid; subpoena deemed invalid). Furthermore, no *de minimis* exception to the amount of the mileage fee exists. *Id.* (invalidating subpoena where mileage fee of less that $5 was omitted).

therefore should be denied summarily, with prejudice, and the Court should further order

Defendants and/or their counsel to pay Plaintiffs' reasonable fees and costs associated with having

to respond to it.[10] Fed. R. Civ. P. 11 (b) & (c) (setting forth the threshold requirements for

representations made in pleadings to the Court and the power of the Court to order counsel to show

cause why they are not in violation of Rule 11).

> **2.    Defendants' Failure to Serve Notice Upon Plaintiffs' Counsel Prior to Serving Mr. Brand Also Rendered the Subpoena Invalid, Excused Mr. Brand from Appearing for Deposition, and Precluded the Imposition of Sanctions**

Rule 45(b)(1) mandates that notice be served on each party prior to the service of a third-

party subpoena. Fed. R. Civ. P. 45(b)(1) ("If the subpoena commands the production of

documents, electronically stored information, or tangible things or the inspection of premises before

trial, then *before it is served, a notice must be served on each party.*") (emphasis added). Like the

requirement for witness and mileage fees, this portion of Rule 45(b)(1) is mandatory. *U.S. v. Philip

Morris Inc.*, 312 F.Supp.2d 27, 37 (D.D.C. 2004) ("Fed.R.Civ.P. 45(b)(1) requires prior notice before

issuing and signing document production subpoenas. No such prior notice was provided. The

violation of Rule 45 … is clear."); *see also Firefighters Institute for Racial Equality ex rel. Anderson v. City of

St. Louis*, 220 F.3d 898, 903 (8th Cir. 2000) (quashing subpoena *duces tecum* filed on the last day of

discovery, without providing prior party notice); *Butler v. Biocore Medical Technologies, Inc.*, 348 F.3d

1163, 1173 (10th Cir. 2003)("We therefore agree that Rule 45(b)(1) requires notice to be given prior

to service of a subpoena.").

Plaintiffs received a copy of the subpoena from Defendants at 4:54 p.m. on Monday, July 28,

2008, which was nearly one hour *after* Defendants had served Mr. Brand with the subpoena at about

---

[10] Defendants' belated service of the required $40 witness fee to Mr. Brand on Monday, August 18—a full three weeks after service of the subpoena on July 28—also did not retroactively cure the subpoena's defects such that there was any validity to Defendants' frivolous Motion to Compel (filed on August 11) requesting that Mr. Brand be held in contempt. In any event, the mileage fee is still omitted, independently rendering the subpoena invalid.

4:08 p.m. **Exhibit A**, Chew Decl. ¶¶ 8, 10. Defendants' counsel's declaration that a copy of the

subpoena was hand-delivered to Mr. Chew at 6:31 p.m. on Friday, July 25, 2008, is false. Koch

Decl. at ¶ 3. Indeed, the very courier record Defendants' counsel cites to support her erroneous and

conclusory statement that a copy of *the subpoena* was hand delivered by Apple Courier, says no such

thing. Rather, all that document shows is that *something* was delivered on Friday evening, July 25, a

proposition Mr. Brand does not dispute. **Exhibit J**. Accordingly, Ms. Koch could not have

personal knowledge of what Apple Courier delivered that day.

Further, Patton Boggs own receiving log reflecting that indeed a package came in from

Defendants' counsel's office on Friday July 25, shows that another hand-delivered package came in

for Plaintiffs' counsel on Monday, July 28 at 4:54 p.m., from Defendants' counsel's office. **Exhibit

K.** *This* was the package containing the requisite service copy of the subpoena. **Exhibit A**, Chew

Decl. ¶ 10. Of course, had Defendants actually hand-delivered the subpoena on Friday, July 25,

there would have been no need to send the courier back on Monday, July 28.

The subpoena therefore was defective and invalid because Defendants failed to serve

Plaintiffs before serving Mr. Brand in violation of Rule 45(b)(1).

Accordingly, Defendants' Motion should be denied and the Court should further order

Defendants and/or their counsel to reimburse Plaintiffs' reasonable fees and costs incurred in

having to respond.

**B.    DEFENDANTS' MOTION TO COMPEL IS MOOT BECAUSE PATTON
BOGGS DID NOT PERFORM LOBBYING SERVICES FOR THE VICINIS;
DEFENDANTS ALSO SHOULD NOT BE PERMITTED TO USE THE
SUBPOENA TO OBTAIN IRRELEVANT, BACK-DOOR DISCOVERY FROM
CAEI, A SEPARATE , NON-PARTY CORPORATE ENTITY**

Defendants are fully aware from the public disclosures attached to their Motion to Compel

that CAEI—not the individual Plaintiffs—retained Patton Boggs LLP to perform lobbying services.

Koch Declaration, at Exhibit 2 (noting in bold that the Firm was hired by CAEI). Defendants are

further aware from Mr. Brand's letter response of August 1, 2008, that he has no documents to produce concerning any lobbying services that Patton Boggs provided to the Vicinis because the Vicinis never retained Patton Boggs to perform lobbying services for them. **Exhibit L** at 2 ("Mr. Brand and the Firm respond that there are no non-privileged documents relating to lobbying services provided to the Vicinis because neither Mr. Brand nor the Firm have provided lobbying services to Juan and Felipe Vicini Lluberes."). Therefore, even assuming *arguendo* that the subpoena was valid—which it was not—Defendants' Motion to Compel is moot as Mr. Brand has fulfilled any obligation he may have had to respond in full, at least with regard to the documents requested in the subpoena.

Defendants nonetheless filed their Motion to Compel with this Court improperly seeking information about CAEI's relationship with Patton Boggs. Indeed, on the first page of their Motion, Defendants concede that the Vicinis are the parties to the Underlying Case, but then blithely proceed to demand information from the "companies they own or control that are involved in the sugar business." Def. Mot. at 5.

The 2000 revisions to the Federal Rules of Civil Procedure narrow the concept of relevance to apply only to "actual claims and defenses" asserted in a case. *Dees v. Hyundai Motor Mfg. Alabama, LLC*, 524 F.Supp.2d 1348, 1350 (M.D. Ala. 2007) (citing the 2000 Advisory Committee Notes to Fed. R. Civ. P. 26(b)(1), which state in part "The Committee intends that the parties and the court focus on the actual claims and defenses involved in the action."). *See also Johns Hopkins University v. Datascope Corp.*, No. WDQ-05-759, 2007 WL 1450367 (D. Md. May 16, 2007) (noting that the 2000 revisions to Fed. R. Civ. P. 26(b)(1) narrowed the scope of permissible discovery from matters relevant to the "subject matter" of the litigation to matters relevant to the "claims and defenses of any party."). While lobbying services conducted for the Vicinis might be pertinent to the partial defense of whether Plaintiffs were limited purpose public figures, lobbying conducted on behalf of

CAEI would not. Defendants in essence are attempting to pierce the corporate veil to get at

information from CAEI without having pled any basis for doing so, and the Court should not

permit such discovery to be taken. *See Ivanov v. Sunset Pools Management Inc.,* 524 F.Supp.2d 13, 15

(D.D.C. 2007)(setting forth the elements necessary to show that an individual is the alter ego of a

corporation such that the corporate entity may be disregarded and individual shareholders and

officers can be held liable for the acts of the corporation); *see also Hofman v. Optima Systems, Inc.*, 683

F. Supp. 865, 870 (D. Mass. 1988) (same).

The only thing Defendants correctly state about this issue is that if there is any dispute over

obtaining discovery from CAEI or its agents, it is a substantive one that already has been briefed and

is under consideration by Judge Woodlock in the Underlying Action:

> To the extent this objection is based on a claim that there is a
> material distinction between lobbying activities by Vicini-owned
> companies and lobbying activities by the Vicinis in their supposed
> "individual capacities," that is a merits argument properly made in the
> [District Court of Massachusetts.]

Def. Mot. at 15 n.11, and at 4 n.2 (noting that issue is in fact under consideration before the District

Court of Massachusetts). However, Defendants are wrong that, pending resolution of this

underlying legal issue regarding corporate separateness, this Court should override the general

presumption against opposing counsel depositions. By conceding that the Court need not

determine the merits of this issue, Defendants also admit that the relevance of the subpoena

depends entirely upon a decision of another Court. Thus, to the extent that this Court considers

relevance as an issue in deciding whether the subpoena should be enforced, it should defer its

decision until the District Court in Massachusetts ultimately decides whether Defendants are entitled

to seek discovery from CAEI.

Defendants' Motion to Compel therefore should be denied as moot because Mr. Brand

already responded in full, stating that there are no documents to produce because, as is clear from

the public lobbying reports attached to Defendants' Motion to Compel, the Vicinis never retained

Patton Boggs to perform lobbying services for them.  Alternatively, to the extent that the Court is

inclined to rule upon the enforceability of the subpoena based upon relevance, the Court should

defer any decision until the Court in the Underlying Action ultimately decides this issue.

## C.    APPLICATION OF THE *SHELTON* FACTORS PRECLUDES MR. BRAND'S TESTIMONY

Even assuming *arguendo* that the subpoena were valid—and it is *not*—and assuming that

Plaintiffs retained Patton Boggs to lobby on their behalf personally—which is *not* the case—

Defendants still would have failed to establish that the extraordinary measure of taking discovery

from opposing counsel is warranted.

It is axiomatic that "depositions of opposing counsel are disfavored," creating a

"presumption against attorney depositions . . . ."  *Corporation for Public Broadcasting v. American*

*Automobile Centennial Comm'n*, 1999 WL 1815561 *1-2 (D.D.C. 1999)(*citing N.F.A. Corp. v. Riverview*

*Narrow Fabrics, Inc.*, 117 F.R.D. 83, 84-85 (M.D.N.C.1987)).[11]  Contrary to Defendants' erroneous

assertion, it is the party seeking to take the deposition of opposing counsel that carries the burden of

satisfying each of the factors set forth in *Shelton v. American Motors Corp.*, 805 F.2d 1323 (8th Cir.

1986).[12]

---

[11] While Plaintiffs acknowledge that the general disfavor giving rise to the presumption against attorney depositions is not absolute and can be rebutted, Defendants' suggestion that opposing counsel depositions are granted routinely without close scrutiny is absurd.  Def. Mot. at 9.  It is worth noting that *In re Subpoena issued to Dennis Friedman*, 250 F.3d 65 (2d Cir. 2003), a case which Defendants rely upon repeatedly to suggest a "flexible approach" to attorney depositions, actually involved an appeal concerning an attorney deposition that was *dismissed as moot*.  The only finding by that court that is not in dispute here is that there is no *absolute* prohibition of attorney depositions.  *Id.*

[12] *See Invesco Institutional (N.A.), Inc. v. Paas*, 244 F.R.D. 374, 393 (W.D.Ky. 2007)("A party who seeks to take the deposition of an opposing counsel, however, bears the burden to show the propriety of and need for deposing the attorney of his opponent. … Nothing in the motion papers related to Invesco's attempt to depose attorney Sheller convinces the Court that the difficult *Shelton* barrier has been surmounted by Invesco."); *Harriston v. Chicago Tribune Co.*, 134 F.R.D. 232, 234 (N.D.Ill. 1990)("The court is hesitant to engender the disruption and possible harassment a deposition of opposing counsel would cause based upon the general assertions of need made by plaintiff.")  *See also American Cas. Co. of Reading, Pa. v. Krieger*, 160 F.R.D. 582, 588 (S.D.Cal. 1995)(considering both the majority and minority rule, and finding in the Ninth Circuit, "it is appropriate to require the party seeking to depose an opposing party's attorney to establish a legitimate basis for requesting the deposition, and to demonstrate that the deposition will not

The *Shelton* factors impose a "difficult burden . . . intended to guard against the 'harassing practice of deposing opposing counsel . . . that does nothing for the administration of justice but rather prolongs and increases the costs of litigation, demeans the profession, and constitutes an abuse of the discovery process." *Pamida, Inc. v. E.X. Originals, Inc.*, 281 F.3d 726, 729-30 (8th Cir. 2002) (quoting *Shelton*, 805 F.2d at 1330); *Bogosian v. Woloohojian Realty Corp.*, 323 F.3d 55, 66 (1st Cir. 2003)("the procurement of trial testimony from opposing counsel is generally disfavored.")(citing *United States v. Yonkers Bd. of Educ.*, 946 F.2d 180, 185 (2d Cir. 1991)).  Specifically, *Shelton* requires that the party seeking the deposition of opposing counsel establish that:

> (1) no other means exists to obtain the information than to depose opposing counsel;
>
> (2) the information sought is relevant and nonprivileged, and
>
> (3) the information is crucial to the preparation of the case.

*Shelton*, 805 F.2d at 1327.  Defendants have failed to offer realistic or cognizable arguments to satisfy any of these three factors.

### 1.    Mr. Brand Is Directly Involved in Representing Plaintiffs in the Underlying Action

Contrary to Defendants' guesswork regarding the extent of Mr. Brand's involvement in this case (Def. Mot. at 3-4), Mr. Brand has been intimately involved as a member of the trial team in the development and implementation of litigation strategy throughout the course of the Underlying Action.  Chew Decl. at ¶ 5.  Thus, as he has been "directly involved in representing a party in the case," whether or not he has appeared at any court hearings, he clearly qualifies as an "opposing counsel" for purposes of the *Shelton* analysis.  *United States v. Philip Morris,* 209 F.R.D. 13, 18 (D.D.C. 2002); *see also Boughton v. Cotter Corp.*, 65 F.3d 823, 929-29 (10th Cir. 1995) (upholding protective order denying deposition of attorney whose role was both as counsel to the party and as spokesman

---

otherwise prove overly disruptive or burdensome.")(citations omitted).

before regulatory agencies); *Nationwide Mutual Insurance v. Home Insurance Co.*, 278 F.3d 621, 628-29 (6th Cir. 2002) (finding that the party requesting the deposition had failed to carry its burden of why lawyer should not be considered "opposing counsel"). Defendants offer nothing more than incorrect conclusory statements and assumptions about Mr. Brand's involvement on Plaintiffs' trial team in asserting that he should not be considered an "opposing counsel" subject to *Shelton*.

2. **Defendants Have Not Demonstrated that the Information Sought Cannot Be Obtained from Sources Other than Opposing Counsel**

Defendants have not satisfied their heavy burden of establishing that Mr. Brand's deposition is necessary because the information they seek is plainly available from sources other than opposing counsel. Defendants merely assert that they would have no idea where they would start to look, and that inquiry into the lobbying performed on behalf of CAEI "would take perhaps hundreds of subpoenas to congressional offices and federal agencies to obtain the information that Brand possesses and that the Subpoena seeks." Def. Mot. at 11 n.9. This is patently absurd in light of the evidence produced so far in the Underlying Action showing that Defendants have been aware for perhaps a year of the names of United States Goverment officials (Members of Congress, State Department Officials and others) who have seen *POS* or who have communicated with Defendants and Fr. Hartley directly about *POS* and/or the Vicinis.

For example, in ███████████████████████████████████

████████████████████████████████████████████

██████████████████████████. **Exhibit F** (███████████████

████████████████████████████████████). Moreover, ███

████████████████████████████████████████████

████████████████████████████████████

███████████████████████████████. **Exhibit E** ███████

████████████████████████████████████

███████). Defendants also obtained documents from the State Department in connection with the Underlying Action—which they admit and discuss in their Motion at 3-4—and could easily have issued a subpoena for a State Department representative on the very topics they seek to discover from Mr. Brand. Indeed, it defies belief that the same State Department officials who informally and gratuitously forwarded the information to Father Hartley in the first place would have been unwilling to disclose to Fr. Hartley or the Defendants what orally took place during the same meeting.

More than bald, conclusory statements are required of Defendants in asserting the burdens of alternative inquiry. Courts typically require a showing that multiple substantive attempts have been made to obtain the information from other sources before a deposition of opposing counsel is allowed. *Compare Thiessen v. General Electric Capital Corp.*, 267 F.3d 1095, 1112 (10th Cir. 2001) (upholding refusal to allow deposition when movant did not affirmatively demonstrate information not available from another source); and *Boughton v. Cotter Corp.*, 65 F.3d at 830-31 (upholding denial of request for deposition because movant did not adequately explore available sources for discovery) *with Sadowski v. Gudmundsson*, 206 F.R.D. 25, 27 (D. D.C. 2002) (allowing deposition of counsel when significant gaps in facts remained after movant attempted other depositions); *Pipefitters Local No. 636 Pension Fund v. Towers, Perrin, Forster & Crosby, Inc.*, 2007 WL 435774 *1 (E.D. Mich. 2007) (allowing deposition of counsel, in part, because movant demonstrated specific unsuccessful attempts to obtain from other sources). Indeed, Mr. Brand does not compel Defendants to conduct any more arduous discovery than Plaintiffs themselves are undertaking.

Defendants have failed to satisfy their burden of demonstrating that this unusual and generally disfavored type of attorney deposition is necessary. Rather than make discrete and reasonable requests of the many Congressional and federal agency officials with whom they or Fr. Hartley communicated directly about *POS* and/or the Vicinis, Defendants instead chose to cut

16

corners on their discovery obligations in order to seek discovery from opposing counsel in the final

days of the discovery period. The Court should not permit Defendants to take Mr. Brand's

deposition based upon their weak, pretextual grounds for seeking opposing counsel's deposition.

3.      **The Information Sought By Defendants Is Neither Relevant Nor Crucial Because It Is Inadmissible for Purposes of the Public Figure Analysis**

Defendants assert that they are entitled to discovery from Mr. Brand because the "subpoena

plainly relate[s] to a contested issue in the litigation – namely, the Vicinis' status as public figures for

purposes of the constitutional law of defamation . . . ." Def. Mot. at 1-2.[13] Defendants fail to

recognize, however, that the public relations or lobbying activities of a victim of defamation who has

employed those services *to respond* to the defamation are inadmissible to prove that the victim was a

limited purpose public figure.[14]

---

[13] Defendants make the overbroad assertion that courts resolving public figures status "regularly consider evidence relating to defamation plaintiffs' efforts to shape the opinions of the public at large and of government decision-makers." Def. Mot. at 13. As a threshold matter, Defendants are attempting to bootstrap discrete, often closed-door activities aimed at educating Congressional and federal agency staff to the distinctly different conduct of overtly thrusting oneself into an existing public controversy through aggressive public relations tactics. Further, none of the authorities cited by Defendants support their contention that lobbying and government relations activities are determinative of a party's public figure status. *See, e.g., OAO Alfa Bank v. Ctr for Public Integrity*, 387 F. Supp. 2d 20 (D.D.C. 2005) (failing to include lobbying or government relations in public figure analysis); *Merco Joint Venture v. Kaufman*, 923 F. Supp. 924 (W.D. Tex. 1996) (same); *Southern Air Transp. Inc. v. Post-Newsweek Stations, Fla. Inc.*, 568 So. 2d 927, 928 (Fla. Ct. App. 1990) (same).

[14] Defendants baldly assert that even if timing confirms—as the public disclosures makes clear—that all lobbying was conducted as a response to the defamatory statements in *POS*, discovery of such services is still relevant to a determination whether the Vicinis are limited purpose public figures. Def. Mot. at 14 n.10. Citing a trio of D.C. cases, Defendants claim that securing lobbying services demonstrates the existence of the Vicinis' access to channels of effective communication and the existence of a prior public controversy.

With regard to the first point, none of Defendants' cases involve lobbying, which as demonstrated in the prior footnote, is quantitatively different from engaging with the media. Moreover, the argument smacks of the same bootstrapping warned against by the Supreme Court in *Hutchinson v. Proxmire*. 443 U.S. 111, 135-36 (1979) (rejecting the "bootstrap" argument that a defamation defendant can create a limited purpose public figure status by publicizing the defamatory statements). *See also Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541 (4th cir. 1994) (individuals publicly responding to alleged defamatory statements did not make them limited purpose public figures). Engaging a well-known lobbying firm speaks merely to the fact that a party has sufficient financial assets—a fact that is irrelevant to determining whether a party has accepted the benefits and detriments of participating in the public marketplace of ideas.

The second point is internally inconsistent. If the lobbying is shown not to precede the first appearance of the Film (an Internet trailer appeared in mid-2005), then the lobbying likewise post-dates any prior public controversy. It will not, as a matter of course, be "probative of … the existence of a prior public controversy." Def. Mot. at 14 n.10.

17

Indeed, it is well established that a private person *does not* become a limited purpose public figure when he seeks to publicly denounce the defamatory conduct and defend his personal reputation. *See, e.g., Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541 (4th Cir. 1994) (individuals claiming they had been portrayed in a television docudrama as having molested their grandchildren did not become public figures by making extensive public statements about the issues in the television show, because they had a right to provide reasonable public replies to the accusations); *Time, Inc. v. Firestone,* 424 U.S. 448, 455 (1976) (socialite did not become a limited purpose public figure by calling press conference to address reporters' inquiries into her divorce proceedings); *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1297, *cert. denied* 449 U.S. 989 (D.C. Cir. 1980) ("responding to press inquiries or attempting to reply to comments on oneself through the media does not necessarily mean that a person is attempting to play a significant role in resolving a controversy."); *see also* Rodney A Smolla, 1 Law of Defamation § 2:37.50 (2d ed. 2007) ("the mere act of responding, even through channels of mass communications, ought not elevate a person to public figure status. … Self-defense is not the same as self-promotion").[15]

The facts surrounding Mr. Brand's lobbying work on behalf of CAEI are abundantly clear

---

[15] Defendants rely upon *Gertz v. Robert Welch, Inc.,* 418 U.S. 323 (1974) for their assertion that Plaintiffs may be "public figures." Def. Mot. at 3. However, the notion that *defending* oneself publicly does not transform a person into a limited purpose public figure is fully consistent with *Gertz* and its progeny. Those cases emphasize that to be considered a limited purpose public figure, the private person must have voluntarily thrust himself into an already-existing public controversy in an attempt to influence the outcome, but reject the idea that the same fault level attaches to private persons dragged unwillingly into a controversy by the defendant's conduct. *See Gertz,* 418 U.S. at 351-52, 342 n.9 ("Of course, an opportunity for rebuttal seldom suffices to undo harm of defamatory falsehood. Indeed, the law of defamation is rooted in our experience that the truth rarely catches up with a lie"); *Hutchinson v. Proxmire,* 443 U.S. 111, 135-36 (1979) (rejecting the defendant's "bootstrap" attempt to create a pubic figure by claiming that the publicity generated by the defamatory publication made the plaintiff a public figure regarding future defamatory comments); *Bruno & Stillman, Inc. v. Globe Newspapers, Co.*, 633 F.2d 583, 589 (1st Cir. 1980) (*citing* L. Tribe, American Constitutional Law 645 (1978)) ("[a] fairly high threshold of public activity is evidently necessary for a finding that a person has voluntarily plunged into a public controversy."); *Bose Corp. v. Consumers Union of U.S., Inc.*, 508 F. Supp. 1249, 1273. (D. Mass. 1981) (the plaintiff must have actively participated in the controversy and "added its voice to the chorus that was already discussing the controversy"); *Jones v. Taibbi,* 512 N.E.2d 260, 268 (Mass. 1987) (uncharged but arrested serial killer suspect defamed by press not a public figure because he did not voluntarily thrust himself into the investigation and subsequent proceedings); *Bowman v. Heller,* 651 N.E.2d 369, 374 (Mass. 1995), citing *Hutchinson,* 443 U.S. at 135 ("Clearly, those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure").

that his and Patton Boggs' lobbying efforts were *in response* to the defamation published by Defendants in *POS*. CAEI did not even retain Patton Boggs to provide lobbying services until *after* the public release of *POS*. Chew Decl. at ¶ 4. Because this entire line of inquiry is inadmissible for the sole purpose Defendants cite in the Underlying Action—to establish Plaintiffs' purported status as limited purpose public figures—*the discovery they seek from Mr. Brand can be neither relevant nor crucial to their case*. Defendants therefore have failed to satisfy both the second and third factors required under *Shelton*.

Accordingly, Defendants' Motion to Compel should be denied, and Mr. Brand's Cross Motion to Quash should be granted.

## IV.    CONCLUSION

For the foregoing reasons, Mr. Brand respectfully requests that the Court deny Defendants' Motion to Compel, including Defendants' request for an Order to Show Cause, that his Cross Motion to Quash be granted, and that the Court order Defendants and their counsel to show cause why they should not be held in contempt for falsely accusing Mr. Brand of contemptuous conduct and requesting sanctions when they knew or should have known that the subpoena served upon Mr. Brand was defective and invalid, precluding the imposition of sanctions as a matter of law. A proposed Order is submitted herewith for the Court's consideration.

Respectfully submitted,

/s/ Benjamin G. Chew
Read K. McCaffrey
Stephen Díaz Gavin
Benjamin G. Chew (D.C. Bar # 418577)
PATTON BOGGS LLP
2550 M St, N.W.
Washington, DC 20037
Telephone: (202) 457-6015

19

Facsimile:  (202) 457-6315
e-mail:  bchew@pattonboggs.com


Counsel for Joseph L. Brand, Esq.


Dated:  August 22, 2008


**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 22nd day of August, 2008, a redacted version of the foregoing

Opposition and Cross Motion to Quash was filed with the Court via its CM/ECF system, and will

be sent electronically to the registered participants as identified on the Notice of Electronic Filing

(NEF), and a complete unredacted version with exhibits was served via first class mail, postage

prepaid, upon:

Elizabeth C. Koch (admitted *pro hac vice)*
LEVINE SULLIVAN KOCH & SCHULZ, LLP
1050 Seventeenth Street, N.W.
Washington, D.C.  20036
Telephone:  (202) 508-1100
Facsimile:  (202) 861-9888
E-mail:  bkoch@lskslaw.com

Counsel for Defendants
Uncommon Productions, LLC
and William M. Haney, III


<u>/s/Benjamin G. Chew</u>
Benjamin G. Chew

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

**UNCOMMON PRODUCTIONS, LLC and
WILLIAM M. HANEY III,**

**Movant,**

**v.**                                          Misc. Case No. 08-00517 (RJL)

**JOSEPH L. BRAND, ESQ.,**

**Respondent.**

---

## DECLARATION OF BENJAMIN G. CHEW

Benjamin G. Chew, do hereby declare pursuant to 28 U.S.C. § 1746 that the following

information is based upon personal knowledge, that I am competent to so testify and that it is both

true and correct.

1.      After graduating from Princeton University in 1984, I received my degree of Juris

Doctor from the University of Virginia School of Law on May 22, 1988.

2.      On April 1, 1996, I was admitted to practice in the United States District Court for

the District of Columbia.

3.      I am a partner at the law firm of Patton Boggs, LLP ("Patton Boggs" or the "Firm"),

which I joined as an associate in September 1988, and am counsel for Felipe Vicini Lluberes and

Juan Vicini Lluberes ("Plaintiffs"), Plaintiffs in the underlying litigation, *Felipe Vicini Lluberes, et al., v.*

*Uncommon Productions, LLC, et al.*, No. 07-CA-11623, pending in the United States District Court for

the District of Massachusetts.  I submit this affidavit in support of Joseph L. Brand's ("Mr. Brand")

Opposition to Defendants' Motion to Compel Compliance and Cross-Motion to Quash Subpoena *Duces Tecum.*

4.    As set forth in Patton Boggs' Lobbying Disclosures attached to Ms. Elizabeth Koch's Declaration in support of Defendants' Motion to Compel, Patton Boggs was retained to perform lobbying services on behalf of Compania Anonima de Explotaciones Industries ("CAEI"), a corporate entity affiliated with the Vicinis.

5.    CAEI retained Patton Boggs immediately after the premier of *The Price of Sugar* at the South by Southwest Film Festival, in Austin, Texas, on March 11, 2007, and well after the debut of a trailer for the Film was circulated on the Internet in mid-2005.

6.    At all times throughout the course of the underlying litigation, Mr. Brand has been directly involved in the Vicinis' representation, participating in the development and implementation of litigation planning and strategy.

7.    On Friday, July 25, 2008, at 6:33 p.m., a copy of the discovery materials that Defendants obtained from the United States Department of State (attached to Ms. Koch's Declaration at Exhibit 1) were delivered to Patton Boggs by courier after the close of business.  A true and correct copy of the Receiving Log from Patton Boggs' delivery booth showing the date and time of this delivery is attached hereto as **Exhibit K**.

8.    According to Exhibit 3 of Decl. Elizabeth Koch, the subpoena was physically served on Mr. Brand by Defendants' process server at 4:08 p.m. on Monday, July 28, 2008.  While I have no reason to doubt the veracity of this statement, Defendants provided me with no prior notice that the subpoena would be served on Mr. Brand.

9.    The subpoena served upon Mr. Brand was not accompanied by any witness or mileage fees.

2

4975110

10.     At 4:54 p.m. on Monday, July 28, 2008, a package from Ms. Koch's firm arrived at our delivery booth. Our Delivery Booth logged that entry accordingly in their Receiving Log. **Exhibit K**. At 4:56 p.m., Steffon Brandon in our Delivery Booth called to apprise me that the package arrived. Shortly thereafter, I retrieved the package, which contained a copy of the subpoena that had been served on Mr. Brand earlier that afternoon.

11.     Counsel for the Defendants e-mailed me twice on Monday, July 28, 2008 (at 9:58 a.m. and 3:27 p.m.), but made no mention of serving any subpoena upon Mr. Brand.

12.     Late in the afternoon of Wednesday, July 30, 2008, I received a Notice of Deposition for Mr. Brand from counsel for the Defendants. **Exhibit M**.

13.     Subsequently, on Friday, August 1, 2008, I wrote a letter to counsel for the Defendants setting forth Mr. Brand's objections and response to the subpoena. **Exhibit L**.

14.     On Monday, August 11, 2008, counsel for the Defendants filed the instant motion.

15.     On Friday, August 15, 2008, I initiated a telephone conference call to counsel for the Defendants to attempt to resolve the discovery dispute. In this conversation, I offered to permit Mr. Brand to testify at deposition, subject to a set of reasonable conditions, including that his deposition and the information obtained in his deposition not be used as a basis on which to seek to disqualify Patton Boggs from serving as Plaintiffs' trial counsel in the Underlying Action.

16.     On Sunday, August 17, 2008, I forwarded a proposed Consent Order which embodied these terms to counsel for the Defendants. Although acknowledging that the subpoena was defective, counsel for the Defendants demanded the Firm pay all costs regarding the instant motion, and refused to waive the right to seek to disqualify the Firm based upon information obtained in Mr. Brand's deposition, betraying Defendants' true intent in seeking discovery from Mr. Brand. Consequently, any compromise became impossible to reach.

17.     On Monday, August 18, 2008, after rejecting our offer, counsel for the Defendants served Mr. Brand a check in the amount of $40 (forty dollars) for the mandatory witness fee, but not any mileage fee.

18.     On Thursday, August 21, 2008, I sent a letter to counsel for the Defendants notifying Defendants that although Mr. Brand refuses to accept the check for the reasons set forth in his Objections and Response to the subpoena, we would hold it pending the Court's ruling on Defendants' Motion to Compel.  **Exhibit N**.[1]

19.     On August 22, 2008, Ms. Koch forwarded to me what purports to be a copy of Apple Courier, Inc.'s delivery log from July 25, 2008.  **Exhibit J.**

I hereby declare under penalty of perjury that the foregoing is true and correct.

Benjamin G. Chew

---

[1] I also note that the letter contained an error in the first line of the first paragraph, in which I incorrectly stated that Mr. Brand was served with the subpoena on Friday, July 25, 2008.  As set forth above, the correct date that Mr. Brand was served with the subpoena was Monday, July 28, 2008—a fact that is not in dispute.

# EXHIBIT B



**PATTON BOGGS** LLP
ATTORNEYS AT LAW

2550 M Street, NW
Washington, DC 20037
202-457-6000

Facsimile 202-457-6315
www.pattonboggs.com

July 17, 2008

Matthew W. Doe
202-457-6540
mdoe@pattonboggs.com

**VIA HAND DELIVERY**

Elizabeth C. Koch, Esq.
Levine Sullivan Koch & Schulz, L.L.P.
1050 17th Street, N.W.
Suite 800
Washington, DC 20036

Re:     Lluberes v. Uncommon Productions, LLC, USDC D. Mass. Case No. 07-CA 11632

Dear Ms. Koch:

    Enclosed, please find documents bates labeled STATE000686 – STATE000790, which were produced by the U.S. Department of State.

Respectfully,

*Matthew W. Doe*

Matthew W. Doe
Senior Paralegal

WASHINGTON DC  |  NORTHERN VIRGINIA  |  NEW JERSEY  |  NEW YORK  |  DALLAS  |  DENVER  |  ANCHORAGE  |  DOHA, QATAR

# EXHIBIT C

**Min, Royce B**

| | |
|---|---|
| **From:** | Christopher Hartley [hartley.christopher@gmail.com] |
| **Sent:** | Friday, June 29, 2007 3:52 PM |
| **To:** | Christopher Hartley |
| **Subject:** | RV: Vicini Facts |
| **Attachments:** | WASHINGTON-#4892972-v2-Vicini_White_Paper.DOC; WASHINGTON-#4893498-v1-Vicini_Leave_Behind.DOC |

This is part of the ongoing dialogue between the State Department and the Patton Boggs law firm defending the Vicini family.


-----Mensaje original-----
De: Searby, David P [mailto:SearbyDP@state.gov]
Enviado el: viernes, 29 de junio de 2007 10:10
Para: Christopher Hartley
Asunto: FW: Vicini Facts

FYI.   I asked the Patton Boggs rep if I could share these with you and he said no problem. Note that they don't mention you.

Cheers,

David Searby, WHA/CAR, Room 4262
Desk Officer for the Dominican Republic
202-736-4322
Fax: 202-647-2901
searbydp@state.gov

6/25/2008

STATE000772

STATE000772

## Haitian Migrant Workers in the Dominican Republic:
### The Facts about the Vicinis

The Vicini family, one of the Dominican Republic's sugar producers, has been criticized for treatment of Haitian migrant workers in the Dominican Republic. This criticism is misdirected. The Vicini family, operators of the Consosrcio Azucarero de Empresas Industriales ("CAEI"), has instituted – and is continuing to implement -- reforms which place its operations as the industry leader. This paper sets out, on the left-hand side, criticism of and observations about the Haitian migrant problem in the Dominican Republic, sometimes directed to the sugar industry in the country, sometimes to the Vicinis or CAEI. These statements come from departments of the U.S. government and main-stream non-governmental organizations. The source of each statement is identified. On the right-hand side, we provide facts relevant to each statement. Often these facts come from a U.S government or NGO publication and where they do we cite to sources. Many of the criticisms, while justified, target the government of the Dominican Republic, not the Dominican sugar industry and not the Vicinis. Other information on the right-hand describes improvements the Vicinis are now making.

For further information, please contact Joseph L. Brand, Aubrey Rothrock, Stephanie Peters, or Scott Thompson at Patton Boggs LLP. 202-457-6000.

| Statement | Comment |
|---|---|
| <u>Trafficking</u> | <u>Trafficking</u> |
| *The State Department's 2006 Country Report on Human Rights Practices section on the Dominican Republic reports that "severe discrimination against Haitian migrants and their descendants, trafficking in persons, and a disregard of fundamental labor rights still continued to be issues."[1]* | **These issues relate to the overall problem of the 700,000 to 1,000,000 Haitian immigrants who are living in the Dominican Republic (this estimate comes from the American Embassy in Santo Domingo) and not just to the 10,000 sugarcane harvesters working in the sugar industry. This report describes actions taken by the Vicini's sugar industry company Consorcio Azucarero de Empresas Industriales ("CAEI") to eliminate trafficking of Haitian migrants and improve the situation of those who now work at CAEI.** |
| *State's 2007 Trafficking in Persons ("TIP") report drops the Dominican Republic from Tier 2 to Tier 2 Watch List for its failure to undertake "vigorous actions to counter official complicity with trafficking activity."* | **Neither CAEI nor the sugarcane industry is mentioned in the 2007 TIP report. Officials at the American Embassy in Santo Domingo report that the extant trafficking does not involve the sugarcane industry. CAEI does not employ new Haitian migrants and has not since February of 2006.**<br><br>**The Haitians currently trafficked to the Dominican Republic are employed largely** |

STATE000773

STATE000773

| Statement | Comment |
|---|---|
| | as sex workers, construction workers, and in some cases as agricultural workers, but not in the sugarcane industry. The government's own subway program in Santo Domingo is a big draw for Haitian migrants. |
| *State's 2006 human rights report did mention the sugarcane industry, as follows: "There were conflicting reports that sugarcane plantations around the country had ceased the practice of transporting new undocumented workers from Haiti. Such workers traditionally played a crucial role in the sugar industry, but were forced to live in conditions that were described as modern-day slavery. The apparent discontinuation of this practice was attributed to government crackdowns on Haitian immigration, investment by private sugar producers in mechanization, and the cessation of large-scale cane harvesting on government-owned plantations. However, at year's end there were allegations that some employers, specifically the Vicini Corporation, had resumed the practice of importing undocumented workers for the sugar fields."* | The practice has ceased and the allegation that "the Vicini Corporation had resumed the practice of importing undocumented workers" is without foundation in fact. All of the 1,340 Haitians who currently work for CAEI were employed by CAEI in the previous year. No new Haitian migrants have been hired since February 2006. There are already more Haitians than the sugar industry needs -- only 10,000 of approximately 700,000 to 1,000,000 Haitian migrants work in the sugar industry, which amounts to approximately 1% of the total. |
| | Mechanization will replace most of the migrant workers. Currently, 40% of CAEI sugarcane is mechanically harvested. CAEI's goal is to use mechanical harvesting on all its properties where the terrain will permit the use of machinery. CAEI estimates that 90% of its sugarcane fields will eventually be mechanically harvested. |
| <u>Nationality Status</u> | <u>Nationality Status</u> |
| *In March 2006, Amnesty International addressed a letter to Dominican Republic President Leonel Fernández Reyna denouncing the expulsion of Haitians and highlighting a September 2005 ruling from the Inter-American Court of Human Rights (Dilcia Yean and Violeta Bosico v. Dominican Republic) that "affirmed the human right to a nationality."[2]* | The American Embassy in Santo Domingo reports that President Fernandez ordered an end to the Dominican army's forced expulsion of Haitian immigrants. |
| *Amnesty International's Annual 2007 Report[3] addressed the tenuous status of migrant workers with the following statement: "The majority of Haitian migrant workers in the Dominican Republic are believed to be in an irregular situation; that is, they do not have legal permission to remain in the country. Some may have entered the country legally,* | The right to nationality is a fundamental human right recognized in international instruments going back to the 1948 Universal Declaration of Human Rights which proclaims in its Article 15: "Everyone has a right to a nationality." |
| | This is a public policy issue to be addressed by the sovereign governments of the Dominican Republic and Haiti. There is nothing a private company like CAEI can do about it. |

- 2 -

| Statement | Comment |
|---|---|
| *but have become irregular migrants because their status has changed over time. Irregular migrant workers are at heightened risk of exploitation and human rights abuses by employers or other non-state agents as well as by state officials. Their lack of legal status makes it extremely difficult for them to assert their rights or to seek redress for abuses."*<br><br>*Amnesty continues to press the issue. Its February 2007 report entitled "Dominican Republic: A life in Transit – The Plight of Haitian Migrants and Dominicans of Haitian descent," observes "that the way in which immigration laws and policies are being implemented is inconsistent with international human rights standards."*<br><br>*The issue of national status of the 700,000 to 1,000,000 Haitian migrants in the Dominican Republic is a major human rights concern of the U.S. government.* | |
| ## Birth Registration<br><br>*The two Dominican Republic human rights of greatest concern to the U.S. government are national status and birth registration. State's 2006 TIP frames the birth registration issue: "The government continues to deny birth certificates to Haitians born in the Dominican Republic, which leaves them more vulnerable to traffickers and also leaves them without access to certain services in the Dominican Republic."*<br><br>*Several NGOs (The International Human Rights Law Clinic at the University of California Berkeley Law School, the Center for Justice and International Law, and the Association of Women of Haitian Descent) brought the issue before the Inter-American Court of Human Rights in Dilcia Yean and Violeta Bosico v. Dominican Republic.*<br><br>*Refugees International presses the issue with statements on its website such as the following: "An estimated two to three million individuals, 20 -25 percent of people residing in the Dominican Republic, are not documented.* | ## Birth Registration<br><br>**The birth registration issue is a major public policy matter for the sovereign government of the Dominican Republic and has been, and still is, one of intense public debate. It was the subject of a 2004 law (Ley General par alas Migraciones, No. 285-04) and a more recent Supreme Court decision The law in Article 28 provides that "Non-resident foreign women who, during their stay in the country, give birth to a child, must go to the Consulate of their nationality for the purpose of registering the child."**<br><br>**The Dominican Republic's Supreme Court upheld the law.**<br><br>**The Dominican government is responsible for the adoption of laws and the implementation of policies in this area. A private company like CAEI has no role in the process.** |

- 3 -

STATE000775

| Statement | Comment |
|---|---|
| *Among them are up to one million individuals of Haitian origin."*[6] | |
| ## Haitian Migrant Workers in the Sugar Industry | ## Haitian Migrant Workers in the Sugar Industry |
| *Amnesty International described the employment of Haitian migrants in its 2007 Annual 2007 Report*[8] *as follows: "The Dominican agricultural sector relies heavily on Haitian migrant workers, most of whom are in an irregular situation even if at the time of contracting them they had a seasonal work permit. In the sugarcane industry, for example, Haitian migrant workers make up 90 per cent of the labour force. The vast majority are employed cutting cane which is the most arduous job in the industry."* | **This report may give the false impression that there is an annual migration of many, many Haitians to work in the Dominican sugarcane fields. That is not the case. There are of course many Haitian migrants in the Dominican Republic, but only a small fraction of them work in the sugar industry. By actual count, CAEI employs only 1,340 sugarcane workers; 90% of these are Haitians. CAEI's sugar mills employ 420 sugar mill workers; 10% of these are Haitians.** |
| *Earlier this year, Amnesty International published "Dominican Republic: A life in Transit – The Plight of Haitian Migrants and Dominicans of Haitian Descent," which stated: "Private and nationalized sugar plantations depend on the large pool of Haitian workers who are paid derisory wages and are subjected to the kind of appalling working conditions that most Dominicans are not prepared to accept."* | **The annual Presidential decree requiring that 85% of an industry's labor force be Dominican specifically excludes the sugar industry, among others.**<br><br>**Poverty is widespread in the country and is common to many Dominicans as well as to the Haitian migrant population. According to USAID, Haiti, with a per capital income of less than $400, is the poorest country in the Western hemisphere. By comparison, the island-sharing neighbor of the Dominican Republic, with its IMF-reported economy of $30 billion, offers a solid, stable, growing economy -- an attraction for many Haitians who migrate there to work.** |
| ## Refugees | ## Refugees |
| *State's 2006 TIP report calles attention to the fact that the Dominican Republic government "did not apply standards agreed upon with the office of the UN High Commissioner for Refugees (UNHCR) to improve receipt and adjudication of refugee claims. The UNHCR withdrew its personnel from Santo Domingo in July 2005 and subsequently monitored migration and refugee issues from a regional office outside the country."* | **The receipt and adjudication of refugee claims is a matter for the sovereign government of the Dominican Republic. A private company like CAEI has no authority over or responsibility for these issues.** |

- 4 -

STATE000776

STATE000776

| Statement | Comment |
|---|---|
| **Forced Labor** <br><br> *State's 2006 human rights report on the Dominican Republic discusses the Dominican law on forced labor: "The law prohibits forced or compulsory labor, and there no longer were reports that it occurred. In previous years, managers regularly prohibited workers on sugarcane plantations from leaving during the harvest, but it appeared that this was no longer the case."* <br><br> *State's comment is contradicted by a press statement posted on the Port-au-Prince, Haiti U.S. Embassy website June 2006: "There is also cross border human trafficking between Haiti and the Dominican Republic. ... Haitians are trafficked to the Dominican Republic for forced labor. ... Haiti is also source and transit country of illegal migration."* | **Forced Labor** <br><br> **CAEI's 1,340 Haitian workers are at will employees and are free to leave CAEI's employment at any time of their choosing. They generally work 12 months each year, 6 months harvesting (for which they are paid weekly in cash based on the weight of cane cut) and 6 months engaged in field work, such as planting and fertilizing (for which they are paid according to a set tariff for each task).** <br><br> **CAEI has hired no new Haitian migrant workers since the signing of an agreement with the Dominican Republic's Secretary of Interior in February 2006.** |
| **Child Labor** <br><br> *The Department of Labor's 2005 Findings on the Worst Forms of Child Labor Report contains the following information about the Dominican Republic: "An estimated 14.5 percent of children ages 5 to 14 years were counted as working in the Dominican Republic in 2000.... A Secretariat of Labor (SET) study estimated that 41 percent of working children ages 5 to 17 worked in services, 21 percent in commerce, 19 percent in agriculture, and 11 percent in manufacturing industries during 2000.... In rural areas children work mostly in agriculture and services. Most child agricultural workers are boys.... Haitian and Dominican children plant and cut sugarcane in the Dominican Republic.... It has been reported that some sugarcane workers, possibly including children, work under conditions of forced labor where they are denied access to their clothing, property, and wages."* | **Child Labor** <br><br> **CAEI does not employ children and has an official "zero tolerance" policy on the issue. CAEI also supports the program to eradicate child labor of Vice President Rafael Albuquerque and first lady Margarita Cedeno de Fernández.** <br><br> **In 2006, CAEI set forth its zero tolerance policy in a formal memorandum for all of its sugar holdings. CAEI's mills at San Cristóbal and San Pedro de Macorís do not purchase sugarcane from independent growers who use child labor and enforce this policy by on-site investigations.** <br><br> **The Dominican government has established the national minimum wage. CAEI then sets the prevailing wage on its property after reaching agreement with the several labor unions representing the sugarcane workers.** |

STATE000777

STATE000777

| Statement | Comment |
|---|---|
| **Bateyes** | **Bateyes** |
| *State's 2006 TIP report[e] states: "Haitians are trafficked into the Dominican Republic to work in the sugarcane industry in shantytowns, referred to as "bateys." The conditions in the bateys are substandard; in some bateys, armed guards reportedly kept workers' clothes and documents."* | **Forty-three bateyes exist on CAEI lands. No armed guards are employed to impose control in any CAEI sugarcane property, including the bateyes. Local law enforcement and the Dominican army both patrol the bateyes.**<br><br>**The bateyes on CAEI properties in general are above the standard for the industry in the Dominican Republic. Many of the existing housing structures on CAEI land are concrete, whereas in other bateyes most of the homes are wooden and are prone to destruction during hurricane seasons.**<br><br>**CAEI has recently committed a capital expenditure of US$6 million to begin consolidating all forty-three of the existing bateyes into four modern living communities where workers will be able to live in their own homes through an "earn-out" program. CAEI is working with local and international NGOs to create these new communities. They will have running water, electricity and a sewage system.** |
| **Worker Conditions in the Bateyes** | **Worker Conditions in the Bateyes** |
| *The Labor Department's child labor report describes conditions in the bateyes:[9]: "Conditions for agricultural workers were poor, particularly in the sugar industry. Most bateyes lacked schools, medical facilities, running water, and sewage systems and had high rates of disease. Company-provided housing was sub-standard.... Most sugarcane workers were Haitian or of Haitian descent. In some bateyes, employers withheld a portion of wages to ensure that workers returned to the fields for the next season's harvest. Sugarcane workers often did not receive medical services or pensions due them even though deductions were taken from their pay."* | **The sugar industry is the only industry in the Dominican Republic, rural or urban, that provides free, on-site housing. CAEI's bateyes currently house not only CAEI sugarcane workers and their families but also Dominicans and Haitian migrants not employed by CAEI.**<br><br>**Facilities at the CAEI bateyes are above industry standard and are continuously being improved. Schooling and medical facilities are provided at many of the bateyes, as is potable water. CAEI's US$6 million dollar capital expenditure program will fund the design and construction of a modern housing community that will consolidate the housing on the existing forty-three CAEI bateyes.** |

- 6 -

STATE000778

| Statement | Comment |
|---|---|
| | The Instituto Domincano de Desarrollo Integral, IDDI, a non-governmental organization, currently working with CAEI to assist in social and economic improvements within the sugarcane communities of Casa Vicini, carries this message on its website:  "In November 2002 IDDI and Casa Vicini, the consortium that owns four sugar mills in the Dominican Republic, signed an agreement to develop the communities that exist in the areas around the sugar mills.   This agreement includes the construction of schools, community centers, HIV/AIDS prevention, primary health care, income generation, education and other similar activities."[14]  CAEI is also engaged in supporting educational programs with NGOs (for example, EDUCA, a local NGO, which has enrolled 3,000 Haitian and Dominican children in schools in the past five years, and FUDECO, an affiliate of Save the Children, which is assisting with the improvement of the schools, housing and overall improvement of the communities in the CAEI bateyes. |
| *"The Dominican Social Security Institute (IDSS) sets workplace safety and health conditions. Both the IDSS and the Ministry of Labor had a small corps of inspectors charged with enforcing standards. The Secretariat of Labor had 185 active inspectors. Inspector positions customarily were filled through political patronage, and inspectors typically took bribes from businesses. Workers complained that inspectors were not trained and did not respond to health and safety complaints. While the law requires that employers provide a safe working environment, in practice workers could not remove themselves from hazardous working situations without losing their jobs."* | CAEI provides its workers, both Haitian and Dominican, with protective equipment as required by law (and negotiation with the unions) and subject to inspection by government authorities. Machetes, gloves and boots are provided to sugarcane workers.  The government regulates the agriculture industry's workforce.  Sugarcane workers generally work six or seven days a week and are paid based upon the amount as determined by weight of the sugarcane harvested.  There are no restrictions on the number of breaks, or the number of leave days, a worker may take.  CAEI maintains a daily log of all of the sugarcane harvesters who report for work each day and does not withhold wages. |
| *The Health Justice Collaborative, a NGO, reports the following batey* | Ninety percent of the sugarcane workers on CAEI properties are Haitian.  Of CAEI's |

STATE000779

STATE000779

| Statement | Comment |
|---|---|
| *demographics/statistics on their website:*<br><br>• *90% of the sugarcane cutters are Haitian or of Haitian descent.*<br><br>• *6% percent report being born in Haiti, the majority of batey residents are second or third generation Haitians or Haitian-Dominicans born in the DR.*<br><br>• *97.5% of inhabitants live in the batey year-round.* [10] | **1,340 Haitian sugarcane workers, the 6% figure of Haitian- born is probably low. CAEI reports that 100% of the inhabitants of the bateyes live there year-round.** |

## Education in the Bateyes

*In 2005 the UN Development Programme (UNDP) report on human development in the Dominican Republic stated that "16 per cent of the bateyes under the State Sugar Council, (Consejo Estatal del Azucar) do not receive medical assistance and only seven per cent have a dispensary or rural clinic. Two-thirds of those living in bateyes do not have access to any sanitation infrastructure and half get their water directly from the rivers." The UNDP report also noted that in nearly one-third of bateyes there is no formal educational provision for the children living there. "It is estimated that a third of those living in these communities cannot read or write."* [11]

## Education in the Bateyes

**Of the forty-three bateyes on CAEI property, thirteen have medical clinics and twenty-six have schools. Sanitation is provided in the form of latrines. Water is paid for by CAEI and provided by tanks. Education in the CAEI bateyes is improving, but this must be seen in the context that the quality of the Dominican Republic's public school system ranks 124 out of 125 countries surveyed in the** <u>Global Competitiveness 2006-2007 Report</u>**. By comparison, there is no publicly-funded education in Haiti.**

## Payment of Haitian Migrant Workers

*The Labor Department's report finds that* [12] *"On sugar plantations, cane cutters usually were paid by the weight of cane cut rather than the hours worked. Observers suspected fraud at some weighing stations and noted that employers sometimes did not provide trucks or carts to transport the newly cut cane at the end of the workday, causing workers to receive lower compensation because the cane dried out overnight and weighed less. The amount of cane a worker could cut varied, but many cane cutters earned less than $2.50 (75 pesos) per day."*

## Payment of Haitian Migrant Workers

**CAEI provides cane carts for the harvesting of sugar cane on their properties. Cane cutters are free to monitor the weigh-in of their cane, and are encouraged to immediately weigh their fresh cut cane as dried out cane ultimately results in a net loss to the company.**

**The average cane cutter earns DOP$105 [US$3.26]** [13] **per ton harvested. This is nearly double the amount paid by some other sugar mills. CAEI pays workers on a weekly basis and offers incentives at Christmas and at the end of the harvesting season, beyond the government's labor law requirements.**

- 8 -

STATE000780

STATE000780

| Statement | Comment |
|---|---|
| | The Dominican government establishes the national minimum wage. CAEI then sets the prevailing wage on its property after reaching agreement with the several labor unions representing the sugarcane workers. |
| <u>Legal Redress</u> | <u>Legal Redress</u> |
| *Amnesty International, in its Annual 2007 Report,[13] described the situation of Haitian migrant workers and their inability to obtain legal redress: "Most irregular migrant workers are reluctant to turn to the authorities to enforce respect for their rights, and are generally fearful of drawing official attention to themselves and so risking deportation to Haiti. Rights in the workplace are virtually non-existent for most of them." The Report went on to say: "Given this ever-present risk of dismissal and deportation, migrant workers often consider they have no choice but to accept poor working conditions and are less likely to seek to exercise their rights fully including their rights at the work place. Haitian migrant workers live in precarious conditions, marginalized and in extreme poverty. Moreover, outside the bateyes they have to confront political and social attitudes that are generally hostile to them without the possibility of redress for the abuses suffered."* | **Haitian migrants have legal standing to bring civil actions and to refer criminal matters to the authorities and they often do so. By contrast, The Haiti legal system is described by the Organization of American States in a special report entitled, "*Haiti: Failed Justice or the Rule of Law? Challenges Ahead for Haiti and the International Community*,"[16] as failing to provide a forum for redress of human rights violations within Haiti.** <br><br> **Sugarcane industry employers have been defendants in civil actions brought by Haitian migrants in the Dominican Republic. But because the Dominican judicial system is perceived to be corrupt, poor migrant laborers might be intimidated. Transparency International ranks the Dominican Republic 99 out of 163 countries surveyed in its 2006 Corruption Perceptions Index. (Haiti is ranked 163). The Dominican judiciary sector is ranked as one of the most corrupt of 14 sectors TI reports on in its 2006 Global Corruption Barometer** |

---

[1] U.S. State Department 2005 Country Report on Human Rights Practices, available at: http://www.state.gov/g/drl/rls/hrrpt/2005/61725.htm

[2] Amnesty International letter from Irene Khan to Dominican Republic President Leonel Fernández Reyna (8. March 2006), available at: http://web.amnesty.org/library/pdf/AMR270012006ENGLISH/$File/AMR2700106.pdf

[3] Amnesty International 2007 Report on the Dominican Republic, available at: http://web.amnesty.org/library/Index/ENGAMR270012007?open&of=ENG-DOM

[4] The U.S. State Department's 2006 Trafficking in Persons (TIP), available at: http://www.state.gov/g/tip/rls/tiprpt/2006/

STATE000781

STATE000781

[5] Refugees International article, Dominican Republic, Haiti, and the United States: Protect Rights, Reduce Statelessness (11. January 2007), available at: http://www.refugeesinternational.org/content/article/detail/9770/

[6] Id.

[7] The U.S. Department of Labor's 2005 Findings on the Worst Forms of Child Labor, available at: http://www.dol.gov/ilab/media/reports/iclp/main.htm

[8] The U.S. State Department's 2006 Trafficking in Persons (TIP), available at: http://www.state.gov/g/tip/rls/tiprpt/2006/

[9] Id.

[10] The Health Justice Collaborative website, available at http://www.thehjc.org/batey_references.html

[11] Amnesty International 2007 Report on the Dominican Republic, available at: http://web.amnesty.org/library/Index/ENGAMR270012007?open&of=ENG-DOM

[12] Id.

[13] Id.

[14] Instituto Domincano de Desarrollo Integral website, available at: http://www.iddi.org/English/Friends/friends.html

[15] Currency converter tool, available online at: http://coinmill.com/DOP_USD.html

[16] Annual Report of the Organization of American States' Inter-American Commission on Human Rights, available at: www.cidh.org

STATE000782

STATE000782

4892972

- 11 -

STATE000783

STATE000783

## Haitian Migrant Workers in the Dominican Republic:
### The Facts about the Vicinis

The Vicini family, one of the Dominican Republic's sugar producers, has been criticized for treatment of Haitian migrant workers in the Dominican Republic. This criticism is misdirected. The Vicini family, operators of the Consosrcio Azucarero de Empresas Industriales ("CAEI"), has instituted reforms which should be applauded, but the Dominican Republic government has failed to address some of the problems of Haitian migrant workers.

Please note the following important facts about the Vicini's sugar operations:

- **Only 1,340 Haitian migrant workers are employed by the Vicinis.** There are 700,000 to 1,000,000 Haitian migrant workers in the Dominican Republic. The Vicinis employ a very small fraction of that number.

- **No new Haitian migrants have been employed by the Vicinis this year and no new Haitian migrants will be employed in the future.** On February 24, 2006 the Vicinis entered into a formal undertaking with the immigration authorities to this effect.

- **$6,000,000 has been committed by the Vicinis to improve the bateyes**, the villages where the migrant sugarcane workers live.

- **The Vicinis are ahead of the governments in alleviating the trafficking situation.** The Dominican Republic was just placed on the State Department's Tier 2 Watch List and the Haitian government is still a "special case" on trafficking issues. The Vicinis, meanwhile, are not hiring new Haitian immigrants and are improving the lot of those now employed.

- **More needs to be done and the Vicinis are doing it.** The Vicinis are working with local NGOs to improve housing and education in the 43 bateyes on its property. Twenty-six of these bateyes now have schools which are educating 3,000 Haitian children. The Vicinis have introduced mechanical harvesting on 40% of its sugar fields and have plans to increase this to the maximum extent permitted by the topography.

For further information, contact Joseph L. Brand, Aubrey Rothrock, Stephanie Peters, or Scott Thompson at Patton Boggs LLP.
202-457-6000.

# EXHIBIT D
# (Filed Under Seal)

# EXHIBIT E
# (Filed Under Seal)

# EXHIBIT F
# (Filed Under Seal)

# EXHIBIT G
# (Filed Under Seal)

# EXHIBIT H
# (Filed Under Seal)

# EXHIBIT I
# (Filed Under Seal)

# EXHIBIT J

| Name | *Bunnell* | 25 July '08 |
|---|---|---|

**Apple** Courier Incorporated

SIGNATURE OF RECIPIENT INDICATES SHIPMENT WAS RECEIVED
IN FULL AND IN GOOD CONDITION EXCEPT AS NOTED.

Motor Dispatch (202) 338-6804
Bicycle Dispatch (202) 338-6800
Customer Service (202) 338-0930
Toll-Free Customer Service (888) 620-3300

| # | From / To | Address | Waiting | # Pcs. | Weight | Control Number |
|---|---|---|---|---|---|---|
| 1 | From / To | 1130 17 / 1111 17 | Printed Name *Casey* / Signature *Casey* | | | Time |
| 2 | From / To | 1050 17 / (Dett Cisco) *Patton Boggs* | Printed Name *STEFON BRANDON* / Signature | | | Time |
| 3 | From / To | Address / Address | Printed Name / Signature | | | Time |
| 4 | From / To | Address / Address | Printed Name / Signature | | | Time |
| 5 | From / To | Address / Address | Printed Name / Signature | | | Time |
| 6 | From / To | Address / Address | Printed Name / Signature | | | Time |
| 7 | From / To | Address / Address | Printed Name / Signature | | | Time |
| 8 | From / To | Address / Address | Printed Name / Signature | | | Time |
| 9 | From / To | Address / Address | Printed Name / Signature | | | Time |
| 10 | From / To | Address / Address | Printed Name / Signature | | | Time |

TERMS AND CONDITIONS: 1. CONTRACT: In tendering the shipment for carriage, the shipper agrees to the TERMS AND CONDITIONS OF CONTRACT, which no agent or employee of the parties may alter or amend, or any current service guidelines. The Service Guide is available upon request. 2. PACKAGING: In tendering the shipment for carriage, THE SHIPPER WARRANTS that the shipment is packaged adequately to protect the enclosed goods and insure safe transportation with ordinary care and handling and that each package is appropriately labeled and is in good order (except as noted) for carriage as specified. The shipper further warrants to Apple Courier, Inc. that the contents of the shipment may be lawfully carried over public highways and/or aboard airline aircraft and is not a prohibited commodity under any applicable law or regulation. 3. DECLARED VALUE AND LIMITATION OF LIABILITY: THE LIABILITY OF APPLE COURIER, INC. IS LIMITED TO THE ACTUAL VALUE OF THE SHIPMENT UP TO $100 unless a higher value is declared at the time of service request. Additional insurance is available at the rate of $1.00 per $100 value. The maximum higher declared value is $5000. Shipments containing items of extraordinary intrinsic value such as currency, furs, precious gems, works of art, etc. are limited to a maximum declared value of $100. When multiple packages are placed in a single service request, the declared value for each individual package will be determined by dividing the total declared value of the shipment by the number of packages indicated. Apple Courier is not liable for loss, delay, mis-delivery or non-delivery not caused by its own negligence or any loss, damage, delay, mis-delivery or nondelivery caused by: (1) the act, default or omission of the shipper, consignee, or consignor; (2) the nature of the shipment or defect or inherent vice thereof; (3) improper or insufficient packaging, securing or addressing of the packages; (4) Acts of God, perils of the air, public enemies, public authorities acting with actual or apparent authority of law, riots, strikes or other local disputes, civil commotions, weather conditions or mechanical delays of vehicle or aircraft. APPLE COURIER SHALL NOT BE LIABLE IN ANY EVENT FOR ANY SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, INCLUDING BUT NOT LIMITED TO LOSS OF PROFITS OR INCOME WHETHER OR NOT APPLE COURIER HAD KNOWLEDGE THAT SUCH DAMAGES MIGHT BE INCURRED. In the event of untimely delivery, Apple Courier will, at your request and with some limitations, refund all transportation charges paid. See Service Guide for further information. 4. CLAIMS: No action may be brought to recover damages for loss or injury to the goods UNLESS WRITTEN NOTICE OF LOSS DUE TO DAMAGE, SHORTAGE OR DELAY IS REPORTED BY THE SHIPPER WITHIN 7 DAYS AFTER THE DELIVERY OF THE SHIPMENT. WRITTEN NOTICE OF LOSS DUE TO NONDELIVERY MUST BE REPORTED BY THE SHIPPER WITHIN 7 DAYS AFTER ACCEPTANCE OF THE SHIPMENT FOR CARRIAGE. No claim for a loss to a shipment will be entertained until all transportation charges thereon have been paid. The amount of claims may not be deducted from transportation charges. Claims for overcharges and refunds must be made in writing to Apple Courier within 90 days of the billing date. All claims must be filed by the shipper. 5. COSTS: Not withstanding the shipper's instructions to the contrary, the shipper shall be primarily liable for all costs and expenses related to the shipment of the package and the costs incurred in either returning the shipper or the shipper or warehousing the shipment pending disposition. The shipper shall be responsible for all costs of collection, damages and expenses including but not limited to, collection agency fees and costs and attorney's fees and costs, whether or not litigation is commenced.

# EXHIBIT K

# PATTON BOGGS LLP

# RECEIVING

| DATE | TIME | PACKAGE FROM | ADDRESSED TO | SIGNATURE |
|------|------|--------------|--------------|-----------|
| 7/28/8 | 6:33ₐ | Koch & Schulz | B. Chew | |
| 7/28/08 | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | 4:54 | Koch & Schulz | B. Chew | |
| 7-29-08 | | | | |
| " | | | | |
| " | | | | |
| 7-30-08 | | | | |
| | | | | |
| " | | | | |
| " | | | | |
| " | | | | |

# EXHIBIT L

**PATTON BOGGS** LLP
ATTORNEYS AT LAW

2550 M Street, NW
Washington, DC 20037-1350
202-457-6000

Facsimile 202-457-6315
www.pattonboggs.com

August 1, 2008

Benjamin G. Chew
202-457-6015
bchew@pattonboggs.com

**VIA E-MAIL AND HAND DELIVERY**

Elizabeth C. Koch, Esq.
LEVINE SULLIVAN KOCH & SCHULZ, LLP
1050 17th Street, N.W., Suite 800
Washington, D.C. 20036

Re:    **Response and Objections to Subpoena of Trial Counsel in** *Felipe Vicini*
*Lluberes, et al. v. Uncommon Productions, et al.*, **Case. No. 07-11632 (DPW)**

Dear Betsy:

On Monday, July 28, 2008, you served a subpoena (the "Subpoena") on my partner, Mr. Joseph Brand, Esq., seeking deposition testimony and documents relating to his and Patton Boggs LLP's (the "Firm") purported lobbying services provided to Plaintiffs Juan and Felipe Vicini Lluberes (the "Vicinis"). This letter shall serve as Mr. Brand's and the Firm's formal response and objections to the Subpoena.

As you know, the Firm has served as trial counsel to the Vicinis in their defamation action against your clients, Defendants William Haney and Uncommon Productions, since the Complaint was filed on August 31, 2007, Civil Action No. 07-11632 (DPW) (D. Mass.) (the "Underlying Action").

As a threshold matter, it is troubling that you waited until the eve of the close of discovery— eight months after Judge Woodlock entered the Scheduling Order in the Underlying Action— to suddenly seek discovery from trial counsel. As you are no doubt are aware, serving a subpoena upon trial counsel is a serious matter that materially interferes with the party's ability to prepare for trial, and therefore is universally disfavored by the courts. The concern is particularly acute where, as here, the parties are approaching the end of discovery, the deadline for further dispositive motions and trial preparation. Following up on the July 28th email of my partner, Read McCaffrey, we fully intend to examine this issue closely and, if appropriate, raise it with Judge Woodlock or with the local district court.

Also troubling is your representation that you served a copy of the Subpoena on me on Friday afternoon, July 25. That is false. I was in the office from early until late afternoon Friday and again on Saturday and Sunday. The first notice I received of your Subpoena was

**PATTON BOGGS**LLP
ATTORNEYS AT LAW

Elizabeth C. Koch, Esq.
August 1, 2008
Page 2

an e-mail from Mr. Brand at 4:31 p.m. apprising me that he had been served and attaching a
copy of the Subpoena. It was only later that day (4:56 p.m.) that I received a call from our
Delivery Booth apprising that a package (containing the Subpoena) had arrived for me. Also,
without explanation, you waited to serve Defendants' formal Notice of Mr. Brand's deposition
until the late afternoon of Wednesday, June 30. Thus, Defendants failed to provide the
Vicinis with the required notice of the Subpoena in violation of Rule 45(b)(1).[1]

Moreover, the Subpoena is deficient in several other material ways, and Mr. Brand and
the Firm hereby object as follows:

1)     The Definition of "Lobbying Services" to include all non-judicial federal
government communications is so vague and overly broad as to encompass information that
is neither relevant to the underlying action nor likely to lead to the discovery of admissible
evidence. Additionally, Mr. Brand and the Firm object to this Definition to the extent that it
encompasses information protected from disclosure by the attorney work product doctrine
and/or the attorney-client privilege.

2)     The Definition of "The Vicinis" also is so vague and overly broad as to
encompass information concerning non-party business entities that is neither relevant to the
underlying action nor likely to lead to the discovery of admissible evidence. Additionally, Mr.
Brand and the Firm object to this Definition to the extent that it encompasses information
protected from disclosure by the attorney work product doctrine and/or the attorney-client
privilege, which would preclude Mr. Brand's testimony on virtually all matters concerning the
Vicinis.

3)     Any information sought from Mr. Brand or the Firm concerning the Firm's
"lobbying" services also can be obtained from more readily accessible sources other than trial
counsel such as public lobbying records or federal government personnel without jeopardizing
the attorney-client relationship in the underlying action and the disclosure of information
subject to the attorney-client privilege or attorney work product doctrine.

4)     The burden of obtaining information from trial counsel and jeopardizing the
attorney-client relationship, particularly at this late stage of the proceedings, also far outweighs
any possible benefit of any marginally relevant non-privileged information that Defendants
might obtain through the Subpoena.

---

[1] All of this begs the question of why you would not also have sent me a copy via e-mail, our usual means of
communicating, especially in light of the fact that you sent me e-mails earlier Monday (at 9:58 a.m. and 3:27
p.m.). Of course, no one has yet to explain how members of the Bar can stand mute (or worse) while the
primary witness in the case (Father Christopher Hartley) commits perjury to avoid having to answer for his prior
falsehoods.

4972386

**PATTON BOGGS** LLP
ATTORNEYS AT LAW

Elizabeth C. Koch, Esq.
August 1, 2008
Page 3

5)     The Subpoena also is overly broad temporally in that it seeks documents from 2003 to the present, which covers lengthy periods of time not at issue in the Underlying Action.

6)     The Subpoena is unreasonably cumulative in light of the discovery already obtained or requested from the Vicinis, and the deposition requested is unreasonably cumulative and duplicative of the document requests propounded in the Subpoena, itself.

7)     The risk of disclosure of privileged attorney-client communications and attorney work product (including information bearing upon litigation strategy) posed by deposing trial counsel far outweighs any potential benefit of any marginally relevant, non-privileged information that trial counsel might have.

8)     Mr. Brand and the Firm further object to the extent that the Subpoena imposes upon them any obligations beyond those set forth in the Federal Rules of Civil Procedure and the Local Rules of the United States District Court of the District of Columbia.

\*     \*     \*

Subject to, and without waiving, the above general and specific objections or any applicable privileges, Mr. Brand and the Firm respond that there are no non-privileged documents relating to lobbying services provided to the Vicinis because neither Mr. Brand nor the Firm have provided lobbying services to Juan and Felipe Vicini Lluberes.

For the reasons set forth above, Mr. Brand will not be made available for deposition on August 5, 2008, or on any other date absent a court order.

Moreover, should you decide to file a motion to compel or take any other action requiring the formulation of a response, we will move for sanctions against you and your clients for abusing the discovery process as a tactic to manufacture grounds to disqualify counsel and will ask for an award of our reasonable fees and costs associated with preparing our responses.

We therefore request that Defendants immediately withdraw the Subpoena and cease further interference with the Vicinis' trial preparations and the attorney-client relationship.

Very truly yours,

Benjamin G. Chew

4972386

# EXHIBIT M

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

**FELIPE VICINI LLUBERES and**
**JUAN VICINI LLUBERES,**

Plaintiffs,

vs.                                                          CASE NO.  07 CA 11623 DPW

**UNCOMMON PRODUCTIONS, LLC**
**and WILLIAM HANEY III,**

Defendants.

## <u>NOTICE OF DEPOSITION</u>

PLEASE TAKE NOTICE that pursuant to Rule 45 of the Federal Rules of Civil

Procedure, Defendants Uncommon Productions, LLC and William Haney III, by their

undersigned counsel, will take the deposition upon oral examination of Joseph Brand on

August 5, 2008 at 10:00 a.m., at the offices of Levine Sullivan Koch & Schulz, 1050

Seventeenth Street, N.W. Washington, D.C. 20036.  The deposition will be taken before a

notary public or other person authorized to administer oaths and will be recorded

stenographically. The deposition shall continue from day to day until completed.

Dated: July 30, 2008

Respectfully submitted,

LEVINE SULLIVAN KOCH & SCHULZ, LLP


By: _____
   Elizabeth C. Koch (pro hac vice)
   Thomas Curley (pro hac vice)
1050 Seventeenth Street, N.W., Suite 800
Washington, DC 20036
Telephone: (202) 508-1100
Facsimile: (202) 861-9888

   Jonathan M. Albano BBO #013850
   Lisa E. Kirby BBO #667802
   BINGHAM MCCUTCHEN LLP
   150 Federal Street
   Boston, MA 02110
   Telephone: (617) 951-8000
   Facsimile: (617) 951-8736

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Notice of

Deposition was served via email and first-class mail, this 30 day of July, 2008 to:

> Benjamin J. Chew
> PATTON BOGGS LLP
> 2550 M Street, N.W.
> Washington, DC  20037
>
> Jessica Block
> BLOCK & ROOS LLP
> 60 State Street
> Suite 3800
> Boston, MA  02109

Elizabeth C. Koch

# EXHIBIT N



**PATTON BOGGS** LLP
**ATTORNEYS AT LAW**

2550 M Street, NW
Washington, DC 20037-1350
202-457-6000

Facsimile 202-457-6315
www.pattonboggs.com

August 21, 2008

Benjamin G. Chew
202-457-6015
bchew@pattonboggs.com

**VIA E-MAIL AND VIA HAND DELIVERY**

Elizabeth C Koch, Esq.
LEVINE SULLIVAN KOCH
& SCHULTZ, L.L.P.
1050 Seventeeth Street, N.W.
Washington, D.C. 20036

Re:    **Defendants' Default as to Requisite Witness Fee; URGENT Request for You to
Correct False Statement in Defendants' Motion to Compel**

Dear Betsy:

As you know, at about 4:10 p.m. on Friday, July 25, 2008, Defendants served my partner
Joe Brand with a deposition subpoena. Not once since the Vicinis filed the Complaint almost
one year ago (August 31, 2007) did Defendants state or intimate that they were seeking his
deposition or that of anyone here at Patton Boggs. Nor did Defendants cite such need in
moving for, and obtaining, an extension of the discovery period until August 11, 2008.

In serving Mr. Brand, Defendants failed to provide the witness fee check required by the
Federal Rules. Earlier this week, on August 18, 2008, more than three weeks <u>after</u> service and
one week <u>after</u> the close of discovery, you belatedly sent via messenger a check to Mr. Brand in
the amount of $40.00. *See* **Exhibit A.** Your sending him the check directly was inappropriate, as
by that time, you were well aware that Mr. Brand was represented by counsel.

Please be advised that Mr. Brand does <u>not</u> accept the check, which we will keep here
pending the Court's ruling on Defendants' Motion to Compel and Mr. Brand's forthcoming
Motion to Quash.

On a related, but more urgent matter, I respectfully insist that you file a Notice of
Correction by no later than noon tomorrow rectifying the false statements set forth on page 6,
footnote 5 of Defendants' Memorandum in Support of their Motion to Dismiss and in your
Declaration at paragraph 3 that a copy of the Brand Subpoena was hand-delivered to me on
September 25, 2008.

**PATTON BOGGS** LLP
ATTORNEYS AT LAW

Elizabeth C Koch, Esq.
August 21, 2008
Page 2

As I informed you via e-mail at 6:53 p.m. on Monday evening, July 28, I did <u>not</u> receive a copy of the Subpoena from your offices until <u>after</u> you served Mr. Brand. *See* **Exhibit B.** Specifically, the package from your offices containing the Brand Subpoena arrived at Patton Boggs at **4:54 p.m.** At **4:56 p.m.**, Steffon Brandon in our delivery booth left me a voicemail message informing that a package (containing the Subpoena) had arrived. Mr. Brand was served earlier that afternoon, at about **4:10 p.m.** Indeed, Mr. Brand sent me notice of this at **4:31 p.m.**, along with a copy of the Subpoena, <u>prior</u> to my receiving a copy of the Subpoena from your office. I have contemporaneous written and audio (saved voicemail) records for all of this chronology.

What you sent me on July 25 were the documents voluntarily produced to Defendants by the State Department, <u>not</u> a copy of the Brand Subpoena. *See* **Exhibit C** (your cover note dated July 25, 2008). I have endeavored to be a gentleman here – and will continue to be – but I insist that you <u>immediately</u> correct the record or we will raise what we consider to be a serious matter to the Court's attention.

Despite these material defects in Defendants' service of the Subpoena, and Plaintiffs' other timely served Objections, we, in an effort to resolve Defendants' Motion to Compel, formally offered via proposed draft Consent Order to produce Mr. Brand for a deposition at a mutually convenient time prior to the September 8 dispositive motions deadline provided that Defendants agree a) to limit the duration to ½ day; b) adhere to a proper scope; and c) not to use the deposition as a pretext for disqualifying Patton Boggs from representing Plaintiffs in the underlying action.

In Defendants' response, you not only refused to limit the duration of the deposition or to forgo a motion for disqualification (revealing that Defendants' stated purpose for Mr. Brand's deposition as a hollow pretext), but you also added a paragraph whereby the Vicinis would have to reimburse Defendants – the same people who falsely accused them of murder and then claimed not to be able to produce the "source" of that false allegation – Fr. Hartley (who, as you know, was expelled from the Dominican Republic by Bishop Ozoria for "serious offenses," specifically Fr. Hartley's outrageous statements about the Bishop (whose conduct Fr. Hartley in turn then publicly assailed on Capitol Hill as "deplorable") – the costs and attorneys' fees "incurred in connection with the Motion and this Consent Order."[1]

---

[1] As you know, several months prior to release of *The Price of Sugar*, Fr. Hartley admitted that "the past violence was not Felipe [Vicini's] fault." Your clients nevertheless proceeded to release the film months later containing that and several other false, defamatory *per se* statements about the Vicinis.

**PATTON BOGGS** LLP
ATTORNEYS AT LAW

Elizabeth C Koch, Esq.
August 21, 2008
Page 3

Very truly yours,

Benjamin G. Chew

Enclosures

4976005

# EXHIBIT A

**LEVINE SULLIVAN KOCH & SCHULZ, LLP**

Joseph L. Brand

25024

Check Number:   25024
Check Date:     Aug 18, 2008

Check Amount:   $40.00

| Item to be Paid - Description | Amount Paid |
|---|---|
| 8-18-08 | 40.00 |

---

**LEVINE SULLIVAN KOCH & SCHULZ, LLP**
1050 17TH ST NW STE 800
WASHINGTON, DC 20036-5514

**SUNTRUST BANK**
65-270/550

25024

Memo:

| DATE | AMOUNT |
|---|---|
| Aug 18, 2008 | $40.00 |

PAY    Forty and 00/100 Dollars

TO THE
ORDER    Joseph L. Brand
OF:

**PROFESSIONAL & EXECUTIVE BANKING**

AUTHORIZED SIGNATURE

⑈⁰250 24⑈  ⑈⁰550 0270 7⑈⁸  70 4531070⑈⁸

# EXHIBIT B

## Chew, Benjamin

**From:**    Chew, Benjamin
**Sent:**    Monday, July 28, 2008 6:53 PM
**To:**    'Elizabeth Koch'
**Subject:**    RE: Motion for Leave

Dear Betsy,

With respect, we do not consent.

Very truly yours,

Ben

P.S. On an unrelated matter, your stunt today with Mr. Brand was beneath you. Contrary to the statement you made in your correspondence to Read McCaffrey today, I did **not** receive a copy of the subpoena until I returned from a meeting late this afternoon (when I saw it in my inbox), *after* you had him served, which, as you know, violates the Rules.

---

**From:** Elizabeth Koch [mailto:EKoch@lskslaw.com]
**Sent:** Monday, July 28, 2008 6:42 PM
**To:** Chew, Benjamin
**Cc:** Wilkinson, Nigel
**Subject:** Motion for Leave

Ben,

Defendants intend to seek leave of Court to file a very brief reply clarifying a few points raised by the Motion for Leave to Take Limited Discovery Out of Time. Because the Court is considering the motion on an expedited basis, defendants will file their motion for leave to file the reply this evening. Will plaintiffs consent to the filing of the reply?

 Sincerely,

 Betsy Koch
Levine Sullivan Koch & Schulz, LLP

# EXHIBIT C

# LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.

WASHINGTON, D.C.        NEW YORK        PHILADELPHIA        DENVER

1050 SEVENTEENTH STREET, N.W.
SUITE 800
WASHINGTON, D.C. 20036
(202) 508-1100 PHONE
(202) 861-9888 FAX
www.lskslaw.com

WRITER'S DIRECT DIAL
202-508-1128
EKoch@lskslaw.com

July 25, 2008

Benjamin Chew, Esq.
Patton Boggs LLP
2550 M Street, N.W.
Washington, DC  20037

     **Re:**   *Felipe Vicini Lluberes, et al. v. Uncommon Productions, LLC, et al.,*
            **Case No. 07 CA 11623 (DPW) (D. Mass.)**

Dear Ben:

     Please find enclosed documents produced by the U.S. State Department bearing Bates numbers STATE-D001 – STATE-D033 in connection with the above-referenced matter.

                          Sincerely,

                          LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.

                          By _____
                            Elizabeth C. Koch

Enclosures

{00138374;v1}

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNCOMMON PRODUCTIONS, LLC and WILLIAM M. HANEY III,**<br><br>                 **Movant,**<br><br>   **v.**<br><br>**JOSEPH L. BRAND, ESQ.,**<br><br><br>                 **Respondent.** | **Misc. Case No. 08-00517 (RJL)**<br><br>**ORAL HEARING REQUESTED** |

### <u>ORDER</u>

Upon consideration of the Motion to Compel Compliance with Subpoena *Duces Tecum* and Request for Order to Show Cause Why Non-Party Joseph L. Brand Should Not Be Held in Contempt ("Motion to Compel") of Movants Uncommon Productions, LLC and William M. Haney III ("Movants" or "Defendants"), Respondent Joseph L. Brand's ("Mr. Brand") Opposition and Cross Motion to Quash Subpoena, the parties' replies thereto, the argument of counsel, and the record, it is hereby

    **ORDERED** that Movants' Motion to Compel is **DENIED**; and it is

    **ORDERED** that Mr. Brand's Cross Motion to Quash is **GRANTED**; and it is further

    **ORDERED** that Movants shall reimburse Mr. Brand for his reasonable attorneys fees and costs associated with responding to Movants' Motion to Compel.

It is **SO ORDERED** this ___ day of _____, 2008.

_____
THE HONORABLE RICHARD J. LEON
UNITED STATES DISTRICT JUDGE